BROSS et al., Appellees and Cross–Appellants,

v.

SMITH et al., Cross-Appellees;

WELLS, Appellant and Cross–Appellee.*

[Cite as *Bross v. Smith* (1992), 80 Ohio App.3d 246.]

Court of Appeals of Ohio,
Butler County.

Nos. CA90–11–217, CA91–04–067.

Decided June 1, 1992.

---

* A motion and cross-motion to certify the record to the Supreme Court of Ohio were overruled in (1992), 65 Ohio St.3d 1431, 600 N.E.2d 676.

*Holbrock & Jonson Law Firm* and *Timothy R. Evans,* for appellees and cross-appellants.

*Rendigs, Fry, Kiely & Dennis* and *Michael E. Maundrell,* for cross-appellee city of Middletown.

*Robert J. Gehring Co., L.P.A.,* and *Robert J. Gehring,* for cross-appellee Earl Smith and appellant and cross-appellee Donald Wells.

*Per Curiam.*

On July 19, 1989, plaintiffs-appellees and cross-appellants, Dennis Bross, Theodore Marsh and Steven Schmidt, filed a complaint against defendant-appellant and cross-appellee, Donald Wells, and defendants and cross-appellees, Earl Smith and the city of Middletown. In their complaint, Bross, Marsh

and Schmidt sought damages for defamation and intentional infliction of emotional distress.

A jury trial commenced on July 11, 1990. The evidence presented at trial revealed that Bross, Marsh and Schmidt are all police officers for the city of Middletown. Smith is the current chief of police, and Wells is the assistant chief of police who holds the rank of major.

In June 1987, the former Middletown Chief of Police, Russell Dwyer, was suspended by former Middletown City Manager William Burns as a result of allegations of misconduct brought by five police supervisors, including Marsh and Schmidt. Shortly after Dwyer's suspension, Wells went on injury leave and did not return until November 1987. Ronald Van Arsdale became acting chief of police after Dwyer's suspension. Smith became police chief on November 4, 1987. Smith asked Wells to return to duty to head the patrol section because he felt Wells could establish discipline that was lacking in that section of the department. Wells became Marsh's supervisor.

As a result of Dwyer's suspension, a severe division developed in the police department. Those who supported Dwyer, including Wells, became known as the "A team." Those who were associated with the individuals who had accused Dwyer became known as the "B team." Schmidt and Marsh, because of their involvement with bringing the allegations against Dwyer, were part of the B team.

Shortly after Dwyer's suspension, a series of vulgar and profane letters began appearing on the department bulletin board and in the mail boxes of the police officers. The first letter provided a list of "rats" including Marsh and Schmidt. Bross was also listed as one of the rats, although he was not involved in the Dwyer investigation. Evidence revealed that Bross had several confrontations with Wells. This first letter stated that "[a]ny mother fucker that rats on a cop is no cop." These "rat letters" as they came to be known, talked about Dwyer's innocence and accused the "rats" of plotting to get Dwyer. A series of letters appeared the summer of 1987 through December 1989. The letters called various individuals and the "rats" collectively vulgar and profane names, made various allegations of wrongdoing, and threatened firing and criminal prosecution of individuals associated with the "B team."

Wells and his wife, Janet, were good friends with Dwyer and his wife, Pat. Wells felt that Schmidt and Marsh and others involved in the Dwyer investigation were part of the conspiracy led by former city manager Burns to "set up" Dwyer and obtain power for themselves. Wells felt the conspiracy was ongoing. Wells stated that when he came back to work following his injury leave, his goal was to investigate and have prosecuted all those involved in the

conspiracy because he felt they committed a felony. Smith testified that he felt the police officers involved in the Dwyer investigation were misled by Burns and that the conspiracy had ended when Burns was discharged by the city. Smith allowed Wells to investigate his conspiracy suspicions and told him to take no action until the results of his investigation were reviewed by the city law department. Wells stated that he did not uncover enough evidence to secure an indictment against the alleged conspirators.

Several officers testified that Wells displayed several inflammatory items in his office. These items consisted of a photograph of a Middletown police cruiser entering Findley, Minnesota, where Burns became city manager after leaving Middletown; a photograph of Officer Ershal Philpot, who was associated with the "B team," standing next to the likeness of Mickey Mouse with a pile of cheese; and a pamphlet on rat control. Wells also used two phrases which were later memorialized on rubber stamps, which some officers claimed were used to deny various requests of "B team" members. One phrase was "wrong team Eugene" and the other was "not in your lifetime Jessie." Wells claimed that the phrase "wrong team Eugene" referred to the swat team and that the other phrase was one he had just heard somewhere.

Some individuals in the police department felt Wells was a divisive element and expressed this view to Smith. One member of the "B team" told Smith that the "A team/B team" division would not end unless Smith transferred Wells out of his supervisory position over the patrol department. Guy Stone, a Middletown city commissioner, testified that the author of a report designed to help unify the police department told him that Wells was "a problem." Smith apparently did consider transferring Wells and testified that he was committed to ending the division in the police department.

Wells adamantly denied writing the "rat" letters and witnesses testifying in his behalf indicated that at least in professional situations he did not use the profane language used in the rat letters.

In June 1988, Wells and his wife held a fiftieth birthday party for Dwyer at their home. Some individuals who attended the party wore "A team" shirts. Sandy Caudill, who was formerly married to police officer Greg Watson, attended the party. Watson was identified with the "A team." Caudill testified that she and her ex-husband sat in the kitchen with Janet and Don Wells. Wells handed a letter to Watson, which he said that he and Dwyer had composed. The letter talked about Marsh, Schmidt and Bross and some others identified with the "B team." Caudill read the letter over her ex-husband's shoulder and stated that it contained "quite a bit of vulgarity." The letter called various individuals "dopers" and other names later to be seen in the rat letters. Caudill testified that the letter stated how "Dwyer had

taking [*sic*] care of them * * * that they all had stabbed him in the back * * * and they would pay for what they had done to him." Wells and Watson discussed the unsigned letter and Wells stated that he would have his wife retype it. Witnesses for Wells testified that the letter was a letter to the editor written by Janet Wells which she asked Watson to review. Caudill stated that the letter she saw definitely was not a letter to the editor. However, Caudill never actually saw any of the rat letters herself, although her ex-husband had read her the contents of some. Caudill stated she could not identify any of the rat letters as being the letter she saw.

At the close of plaintiffs' case, the trial court admitted the rat letters into evidence over defendants' objections. The trial court granted a directed verdict in favor of Smith and the city of Middletown on all claims by all three plaintiffs. The court also granted a directed verdict to Wells on all claims by Bross and Schmidt and on Marsh's claim for defamation. As to Bross's and Schmidt's claims for intentional infliction of emotional distress, the court specifically concluded that they failed to present sufficient evidence that they suffered severe emotional distress. The court denied Wells's motion for directed verdict as to Marsh's claim for intentional infliction of emotional distress and allowed the issue to go to the jury.

The jury returned a verdict in favor of Marsh, awarding him compensatory damages of $100,000 and punitive damages of $500,000. Bross, Schmidt and Marsh filed motions for a new trial, which were overruled by the trial court. Wells filed a motion for a new trial, for a remittitur and for relief from judgment. The court originally granted Wells's motion for remittitur, concluding that the award of damages was the result of passion and prejudice and was against the manifest weight of the evidence. The court granted a remittitur of $50,000 on the compensatory damages and $475,000 on the punitive damage or, in the alternative, a new trial. After the parties sought a clarification of the court's order, the court ordered a new trial solely on the issue of damages. Wells filed a timely appeal and appellees Bross, Schmidt and Marsh filed a cross-appeal.

Wells presents seven assignments of error for review; appellees present three assignments of error for review. All assignments of error are set out in their entirety in Appendix A attached to this decision. However, we shall address the assignments of error in a sequence that is different from that which appears in Appendix A.

In his second assignment of error, Wells states that the trial court erred in "admitting documents alleged to have been written by the defendant Wells as they were not properly authenticated." Wells argues that the alleged rat letters should not have been admitted into evidence because insufficient

evidence was presented showing that Wells authored the documents. We find this assignment of error is not well taken.

Evid.R. 901(A) provides:

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

One manner of authenticating a document is to have a witness with knowledge testify that the document is what its proponent claims it to be. Evid.R. 901(B)(1).

Wells argues that since appellees did not present sufficient evidence that he wrote each of the nine rat letters, they were not adequately authenticated. Wells claims that "the major dispute in this case is whether Wells actually wrote" the letters. Certainly, in a broad sense, appellees were attempting to prove that the rat letters were documents authored by Wells; indeed, the authorship of the letters was an ultimate issue of fact for the jury to decide. However, on a more basic level, appellees claim the documents they presented into evidence were the actual "rat letters," *i.e.*, they were the letters at issue, the letters that defamed them and caused them emotional distress.

1 Weissenberger Ohio Evidence (1991), Section 901.14, discusses the authentication requirement:

"A writing may be authenticated under Evid.R. 901(B)(1) by testimony of a witness who has firsthand knowledge of the execution, preparation or custody of the writing. For example, where connective relevancy involves attributing authorship or execution to a particular individual, a person who was present at the signing of the document may testify that the document offered at trial is the same one he saw executed by a particular individual. Additionally, a witness may authenticate a writing based upon his familiarity with the writing, acquired by having read, typed, or prepared it, or by having supervised its preparation or having had custody of the document. * * * Any firsthand knowledge of a writing, however acquired, is an appropriate basis for testimony on the issue of authentication where the testimony logically connects the documents with the issues of the case."

In the present case, no one seriously disputed that the letters appellees introduced into evidence were the "rat letters." Several witnesses testified that the exhibits were the letters they had seen on the bulletin board in the department or had received in their mailboxes. Marsh, Schmidt and Bross identified the letters as the letters that were distributed which caused them distress. "Authentication procedure is a form of relevancy; that is, authenti-

cation connects the particular evidence sought to be introduced to the issues or persons involved in the trial." Staff Note to Evid.R. 901(A). Evid.R. 901 seeks to screen out "evidence which cannot meet a minimal threshold test of connective relevancy." Weissenberger, *supra*, at Section 901.2. We believe there was sufficient evidence to connect the letters to the issues involved in the trial and to show that the exhibits were what appellees claimed they were. See *State v. Kehn* (1977), 50 Ohio St.2d 11, 15–16, 4 O.O.3d 74, 76, 361 N.E.2d 1330, 1333, certiorari denied (1977), 434 U.S. 858, 98 S.Ct. 180, 54 L.Ed.2d 130.

If we were to accept Wells's argument that proof of authorship is required before a document could be admitted into evidence, then a document whose authorship is questioned or disputed could never be admitted into evidence for any reason. We do not believe the Rules of Evidence require this result. Wells is really arguing that there was insufficient evidence from which the jury could conclude that Wells wrote the letters, which is an entirely different question than whether the letters were properly authenticated. Accordingly, Wells's second assignment of error is overruled.

In their first and third assignments of error, appellees argue that the trial court should not have granted a directed verdict on all defamation claims and on Bross's and Schmidt's emotional distress claims. In his third and fourth assignments of error, Wells argues that his motion for directed verdict for judgment N.O.V. as to Marsh's claim for intentional infliction of emotional distress should have been granted. Wells argues that Marsh failed to present sufficient evidence of actual malice as required by *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41. Because resolution of these assignments of error involve the same issues of law, we will consider them together. We find that Wells's assignments of error are well taken and are dispositive of the appeal.

In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the United States Supreme Court held that a public official may not recover damages for defamation unless the official proves that the defamatory statement was made with actual malice. *Id.* at 280–81, 84 S.Ct. at 726, 11 L.Ed.2d at 707. Actual malice in defamation cases may be demonstrated by evidence that the defendant published the statement at issue "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 281, 84 S.Ct. at 726, 11 L.Ed.2d at 707; *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177, paragraph one of the syllabus, certiorari denied (1988), 487 U.S. 1206, 108 S.Ct. 2849, 101 L.Ed.2d 886. Police officers acting within the scope of their official capacity are public officials and therefore enjoy only limited protection from public discussion and criti-

cism.  *Mueller v. Storer Communications, Inc.* (1988), 46 Ohio App.3d 57, 58, 545 N.E.2d 1317, 1319.

Two recent United States Supreme Court decisions affect the outcome of the present case.  *Hustler, supra,* relied upon by Wells, arose out of an ad parody published in Hustler Magazine which portrayed Rev. Jerry Falwell as having engaged in a drunken, incestuous rendezvous with his mother in an outhouse.  Falwell filed suit against the magazine and its publisher, Larry Flynt, for, among other things, libel and intentional infliction of emotional distress.  In the trial court, a jury returned a verdict in favor of Hustler on the libel claim, specifically finding that the ad parody could not "reasonably be understood as describing actual fact * * *."  *Hustler, supra,* 485 U.S. at 49, 108 S.Ct. at 878, 99 L.Ed.2d at 47.  However, the jury found in Falwell's favor on the emotional distress claim and awarded him compensatory and punitive damages.  The court of appeals affirmed the verdict in Falwell's favor.  The United States Supreme Court reversed, holding that public figures and public officials may not recover for the tort of intentional infliction of emotional distress without showing that the publication contained a false statement of fact made with actual malice.  *Id.* at 56, 108 S.Ct. at 882, 99 L.Ed.2d at 52.  The court declined to deny First Amendment protection to speech that is patently offensive and is intended to inflict emotional injury, even when the speech could not have reasonably been interpreted as stating actual facts about the public figure involved.  *Id.* at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48.

In *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1, the Supreme Court rejected a distinction made by many lower courts between fact and opinion.  It declined to create "a wholesale defamation exemption for anything that might be labeled 'opinion.' "  *Id.* at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17.  Instead, the court concluded that the dispositive question was whether the alleged defamatory statement is sufficiently factual to be susceptible of being proved true or false.  *Id.* at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19.

Nevertheless, the *Milkovich* decision reassures that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."  *Id.* at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18.  The *Milkovich* decision also reiterates that statements which cannot reasonably be interpreted as stating actual facts about an individual are equally protected.  *Id.,* citing *Hustler, supra,* 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48.  "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation."  *Milkovich, supra,* at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 19.

In *Milkovich,* a newspaper published a column which implied that Milkovich, a high school wrestling coach, lied under oath in a judicial proceeding. The Supreme Court concluded that the connotation that Milkovich committed perjury is sufficiently factual to be susceptible of being proved true or false. It stated: "This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression." *Milkovich, supra,* at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19.

In the present case, the trial judge granted a directed verdict in favor of all defendants on all defamation claims, but allowed Marsh's emotional distress claim to go to the jury. However, we conclude that the only plausible basis to grant a directed verdict on the defamation claims is insufficient proof of actual malice, *i.e.,* that the statements were made with knowledge that they were false or with reckless disregard of whether they were true or false. Under the Supreme Court's holding in *Hustler,* for a public official to prevail on a claim of intentional infliction of emotional distress, the official must also prove actual malice. We therefore conclude that in this case the defamation and emotional distress claims must stand or fall together. If a directed verdict was proper as to the defamation claims, it was proper as to the emotional distress claims. Similarly, if the defamation claims should have gone to the jury, then the emotional distress claims should also have gone to the jury provided the other elements of the tort were sufficiently proven.

We find the application of the principles set forth in *Hustler* and *Milkovich* to the present case to be problematic. The writings in this case seem to fall in a gray area between the writings in *Hustler* and in *Milkovich.* The rat letters contain assertions that are arguably provable as true or false. For example, was Bross a "doper" or "pill head," *i.e.,* did he use illegal drugs; did Marsh and Schmidt "fuck" the chief, *i.e.,* did they falsely accuse the chief to obtain power for themselves; did Dwyer "cover" for them; did Marsh and Schmidt steal ammunition; were the rats "fucking each other's wives and girlfriends," *i.e.,* engaging in the same types of sexual misconduct of which they accused Dwyer? Nevertheless, it is certainly arguable that the letters use the "sort of loose, figurative or hyperbolic language which would negate the impression" that these individuals committed these acts. Further, the "general tenor" of the letters could negate any impression that the "rats" committed any improprieties. Accordingly, we have examined some lower court cases interpreting *Hustler* and *Milkovich.*

In *Phantom Touring, Inc. v. Affiliated Publications* (C.A.1, 1992), 953 F.2d 724, a touring company that produced a musical-comedy version of "The

Phantom of the Opera" sued a Boston newspaper. In a series of articles, the newspaper questioned whether the touring company's advertisements made the distinction between the touring company's production of "Phantom" and the hugely successful Andrew Lloyd Webber play. The author of the articles stated that the touring company's production had been "thriving off the confusion created by the two productions." The article quoted a drama critic for the Washington Post who said that its version "bears as much resemblance to its celebrated counterpart as Jell-o does to baked Alaska" and who further described the show as "a rip-off, a fraud, a scandal, a snake oil job." Several articles suggested not only that the touring company was benefiting from the mistaken identity, but that the confusion was intentional.

The First Circuit Court of Appeals concluded that the quoted language describing the production as "a rip-off, a fraud, a scandal, a snake-oil job" was figurative and hyperbolic, and there was no objective evidence which could disprove it. It also said whether the touring company's "Phantom" is "fake" or "phony" is also unprovable since those adjectives admit numerous interpretations. *Id.*, 953 F.2d at 728. The court concluded that the claim of defamation was colorable in only one respect. Two of the articles written by the theatre critic for the newspaper contained language insinuating that the "Phantom" touring company was marketing its production dishonestly and that it was deliberately confusing the public. The court stated that "[a]rguably, the connotation of deliberate deception is sufficiently factual to be proved true or false, and therefore is vulnerable under *Milkovich*." *Id.*, 953 F.2d at 729. However, the court went on to state that "we think the context of each article rendered the language not reasonably interpreted [*sic*] as stating 'actual facts' about appellant's honesty. The sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that [the critic] was expressing a point of view only. As such, the challenged language is immune from liability." *Id.* See, also, *Don King Productions, Inc. v. Douglas* (S.D.N.Y.1990), 742 F.Supp. 778.

A federal district court reached the opposite result in *Church of Scientology Internatl. v. Eli Lilly & Co.* (S.D.N.Y.1991), 778 F.Supp. 661, in which the Church of Scientology filed a defamation suit against Eli Lilly, a brokerage firm, and a securities analyst employed by the brokerage firm. In response to a newspaper article about some of the alleged side effects of the drug Prozac, which is manufactured by Eli Lilly, the securities analyst wrote an "advisory" recommending that investors continue to buy Eli Lilly stock. He wrote:

"The final addition to Prozac's package insert in May concerned one case of 'violent behavior.' In this case, a depressed man taking Prozac committed mass murder. *Interestingly, this man, Mr. Wes Becker [sic], happened to be*

*a member of the Church of Scientology. The Church and other related special interest groups have, in our opinion been on a vendetta to discredit Prozac."* (Emphasis in original.) *Id.* at 664.

The federal district court concluded that these statements were factual assertions that were actionable under *Milkovich, supra.* The court went on to state:

"Furthermore, the context is substantially equivalent to an internal memo, and its tone is business-like and solemn. * * * Although subjective in tone, the commentary purports to be based on actual facts, and to be pointing out their implications, not to be making a personal prediction or hyperbolic characterization. The impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion." *Church of Scientology, supra,* 778 F.Supp. at 668. See, also, *Unelkco Corp. v. Rooney* (C.A.9 1990), 912 F.2d 1049, certiorari denied (1991), 499 U.S. ——, 111 S.Ct. 1586, 113 L.Ed.2d 650.

■ We find that the rat letters are more like the articles in *Phantom Touring* than the investment advisory described in *Church of Scientology,* in that their general tenor negates any impression that the statements contained in them are factual assertions. The letters are so couched in exaggeration and hyperbole and are so subjective in tone that a reasonable person could only conclude that the author was voicing an opinion rather than stating actual facts. Therefore, pursuant to *Hustler* and *Milkovich, supra,* we hold that the letters fall within the realm of protected speech and cannot subject the author to liability for defamation or intentional infliction of emotional distress.

We cannot dispute the jury's conclusion that the letters are outrageous, nor can we dispute an expert witness's conclusion that they are the product of a sick, paranoid mind. Certainly the author could have found a better method and a better forum to express his views. However, public debate cannot be suppressed merely because speech is outrageous. " 'Outrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Hustler, supra,* 485 U.S. at 55, 108 S.Ct. at 882, 99 L.Ed.2d at 52.

■ In a defamation case, the question whether evidence in the record is sufficient to support a finding of actual malice is a question of law. An appellate court has an obligation to examine the record and make sure the " 'judgment does not constitute a forbidden intrusion on the field of free expression.' " *Milkovich, supra,* 497 U.S. at 17, 110 S.Ct. at 2705, 111

L.Ed.2d at 17, quoting *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515. Accordingly, we conclude that the trial court properly granted a directed verdict in favor of Wells and the other defendants as to the defamation claims and Bross's and Schmidt's emotional distress claims. The trial court erred in overruling the motion for a directed verdict as to Marsh's emotional distress claim. Accordingly, appellees' first and third assignments of error are overruled and Wells's third and fourth assignments of error are sustained.

Because we consider the constitutional issues to be dispositive of the appeal, we need not address the other issues raised by the parties and, in the interest of judicial economy, we decline to do so. All other assignments of error set forth in the appeal and the cross-appeal are overruled.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed in part and reversed in part, and this cause is dismissed.

*Judgment accordingly.*

JONES, P.J., KOEHLER and WILLIAM W. YOUNG, JJ., concur.

### APPENDIX A

Wells presents seven assignments of error for review, as follows:

Assignment of Error No. 1:

"The court did not err in dismissing the defamation claims of all plaintiffs-appellants, and the intentional infliction of emotional distress claims of plaintiff-appellants [*sic*] Bross and Schmidt."

Assignment of Error No. 2:

"The court erred in admitting documents alleged to have been written by the defendant-appellee Wells as they were not properly authenticated."

Assignment of Error No. 3:

"The trial court erred in overruling the defendant-appellee Wells' motion for a directed verdict as to the intentional infliction of emotional distress claim of the plaintiff-appellant Marsh."

Assignment of Error No. 4:

"The trial court erred in denying the defendant-appellee Wells' motion for judgment notwithstanding the verdict as to the intentional infliction of emotional distress claim of plaintiff-appellant Marsh."

Assignment of Error No. 5:

"The trial court did not err in ordering a new trial when it found that the verdict was the result of passion or prejudice."

Assignment of Error No. 6:

"The trial court erred in finding that the defendant-appellee Wells was only entitled to a new trial on damages after it had determined that the verdict was the result of passion or prejudice."

Assignment of Error No. 7:

"The verdict of the jury was against the manifest weight of the evidence."

Bross, Schmidt and Marsh, in their cross-appeal, present three assignments of error for review, as follows:

Assignment of Error No. 1:

"The court erred in dismissing plaintiffs Bross and Schmidt's claims against all defendants and plaintiff Marsh's claims against defendants Earl Smith and the city of Middletown, and defamation claim against defendant Wells."

Assignment of Error No. 2:

"The court erred in granting a new trial on the subject of damages in the claim of Marsh vs. Wells."

Assignment of Error No. 3:

"The court erred in dismissing the defamation claims of all the plaintiffs."