CONDIT, Appellant,

v.

CLERMONT COUNTY REVIEW et al., Appellees.

[Cite as *Condit v. Clermont Cty. Review* (1994), 93 Ohio App.3d 166.]

Court of Appeals of Ohio,
Clermont County.

No. CA93–08–055.

Decided Feb. 14, 1994.

Condit & Dressing Co., L.P.A., John W. Dressing, for appellant.

*Keating, Muething & Klekamp* and *Richard L. Creighton, Jr.;* and *Schuh & Goldberg* and *James K. Ferris,* for appellees.

---

*Per Curiam.*

Plaintiff-appellant, James J. Condit, Sr., appeals a decision of the Clermont County Court of Common Pleas granting summary judgment in favor of defendants-appellees, The Clermont County Review, Mt. Washington Press, Nichols Publishing Company, Dennis A. Nichols, and Anita M. Nichols. Anita Nichols is the owner of Nichols Publishing Company, which publishes the Clermont County Review and Mt. Washington Press. Dennis Nichols, her son, is the editor and chief operating officer of the two papers.

On November 19, 1990, appellant filed a complaint against appellees for publishing two allegedly defamatory editorials. Appellant later amended his complaint to include additional causes of action related to subsequent publications. The amended complaint asserted causes of action for libel and intentional infliction of emotional distress for each of five publications.

Appellees filed three motions seeking summary judgment on all ten causes of action in the complaint. The material supporting and opposing summary judgment show that in 1979, appellant's son, James Condit, Jr., formed the Cincinnatus Party, the central theme of which was opposition to abortion. In 1979, the Cincinnatus Party ran five candidates for the Cincinnati City Council election, including Condit, Jr. However, the local Right to Life organization headed by John C. Wilke, M.D. endorsed only two of the Cincinnatus Party candidates. Condit, Jr. made comments to the local press critical of Wilke's decision. Wilke responded that his organization issued city council endorsements for the first time to "disabuse the public of the idea that the [Cincinnatus] Party represents the pro-life movement." Similarly in the 1981 council election, Barbara Wilke, John Wilke's wife, was quoted as saying that Right to Life would not endorse Cincinnatus Party candidates because they were not electable.

Though appellant was not a founding member of the party, he and his wife provided financial support. Further, appellant, who is an attorney, donated his legal services and represented the party when it was involved in litigation. Appellant acknowledged that, as a result of the litigation, he became "very visible" and became publicly associated with the Cincinnatus Party. Appellant also attended some party events; however, he was not a board member and had no formal role in the formation of the party's agenda.

In October 1986, Condit, Jr. addressed a meeting of anti-abortion activists and made comments which were widely reported in the local media as being anti-Semitic. Though he was criticized by local religious leaders and other individu-

als, Condit, Jr. stood by his statements, claiming he was misunderstood. Subsequently, the local press also reported that he was handing out anti-Semitic literature.

Condit, Jr. ran for city council in 1989 and as the sole candidate of the Cincinnatus Party. On November 1, 1989, the Mt. Washington Press published an editorial about the city council race written by Dennis Nichols. In regard to appellant and his son, the editorial stated:

"James Condit, Jr., perennial candidate of the Cincinnatus Party, is a colorful candidate, but only because he is deranged. He wants to regulate music and interest rates, the latter largely in the conviction that Jews run banking through a world-wide conspiracy, and he passes out anti-Semitic tracts to that effect, one of which we have saved. His political party consists largely of his father and himself, which is one blessing. It started out as a single-issue anti-abortion effort, but responsible pro-lifers quickly disavowed all connection with the Condits. They would be dangerous if they could."

In 1988 and 1990, appellant, as part of a group known as "The Platform Republicans," ran for the position of chairman of the Hamilton County Republican Party. At the time, appellant was a precinct executive, a position to which he was elected in 1989. In previous years, he had also been a ward chairman. The Platform Republicans were a group within the Hamilton County Republican Party who wanted the local party to "adopt and abide by" the National Republican Party platform, particularly in regard to abortion. In their battle to oust then chairman, Ralph Kohnen, the group received substantial press coverage. Appellant lost both bids for the chairmanship.

On April 25, 1990, shortly before the May Republican primary, the Mt. Washington Press published another editorial by Dennis Nichols which stated in pertinent part:

" * * * That brings us to the question of whether the Condits, James Sr. and James Jr., are fit reformers.

"That they aren't mainstream is relevant in politics. A salesman has to sell, and the Condits lose all their campaigns—badly. But their record just hints at the real problem. These people are anti-abortionists whom even Right to Life shuns.

"The real problem is that the Condits are everything their worst enemies suspect.

"Their thinking is called right-wing, but it has no kinship to the limited-government conservatism of most Republicans.

"The Condits follow the path of a European ideology of church, tribe, tradition, and authority. The word is overused, but they're fascists.

"Moreover, the Condits' fascism—James Jr.'s on documented evidence—bears that characteristic bond of malcontents through the ages: anti-Semitism. When they lose their struggles, they blames [*sic*] the Jews. James Jr.'s presentation gives no cause to hope that his father differs from his nut theories, though James Sr. is more circumspect in what he says.

" * * *

"The Condits calls themselves conservative Catholics and fancy themselves defenders of the faith. But the ideas they extol have done immeasurable violence over the centuries both to the Jewish people and to the Roman Catholic Church.

" * * *

"But the Condits soil what they touch. Their campaign is not reform, it's infiltration. Were the Condits to gain a strong voice in any party, their voice would destroy that party.

"They mounted the abortion issue because it has wide appeal. Understandably, many good people joined the effort, being morally opposed to abortion, but not knowing the Condits. Were the Platform Republicans to prevail, most of these people probably would abandon the Condits."

After appellant filed his complaint, the Mt. Washington Press published two news articles, one dated November 14, 1990 and one dated June 3, 1992, about the litigation. These articles were written by reporter Greg Flannery and approved by Dennis Nichols. These articles repeated the allegations against appellant and quoted Dennis Nichols as saying that he stood by his statements because they were true. Additionally, the paper also published an editorial by Dennis Nichols on May 27, 1992, in which he asserted that the Platform Republicans were not fit to lead the Republican Party in Hamilton County unless they disavowed the bigotry of Condit, Jr. Nichols stated that, although appellant denied being anti-Semitic, he has "a long history of supporting his son * * * despite the younger Condit's crackpot statements and fomenting of hate."

The trial court concluded that appellant is a public figure and that he had failed to meet his burden of proving actual malice with convincing clarity. Therefore, the trial court granted summary judgment in favor of appellees on all ten causes of action in the complaint. This appeal followed.

Appellant presents three assignments of error for review as follows:

"Assignment of Error No. 1:

"The Trial Court erred in granting Defendants' Motion for Summary Judgment as to Counts One, Two, Three and Four.

"Assignment of Error No. 2:

"The Trial Court erred in granting Defendants' Motion for Summary Judgment as to Counts Five, Six, Nine and Ten.

"Assignment of Error No. 3:

"The Trial court erred in granting Defendants'· Motion for Summary Judgment as to Counts Seven and Eight."

Appellant argues these assignments of error together, and we will consider them together. We conclude that reasonable minds could differ as to whether appellant presented sufficient evidence to prove actual malice with convincing clarity. Therefore, we find appellant's assignments of error to be well taken.

 Public officials and public figures may not recover damages for defamation unless they prove by clear and convincing evidence that the defamatory statement was made with actual malice. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806–807; *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 280–281, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706–707. Similarly, public officials and public figures may not recover for the tort of intentional infliction of emotional distress relating to a publication without showing that the publication contained a false statement of fact made with actual malice. *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41, 52; *Bross v. Smith* (1992), 80 Ohio App.3d 246, 256, 608 N.E.2d 1175, certiorari denied (1993), 508 U.S. ——, 113 S.Ct. 2340, 124 L.Ed.2d 251.

 Actual malice may be demonstrated by evidence that the defendant published the statement at issue "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co., supra,* at 281, 84 S.Ct. at 726, 11 L.Ed.2d at 706–707. Actual malice may not be inferred from evidence of ill will or deliberate intention to injure because the focus of the inquiry is not on the defendant's attitude toward the plaintiff but on the defendant's attitude towards the truth or falsity of the statement. *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 79–80, 518 N.E.2d 1177, 1180–1181, certiorari denied (1988), 487 U.S. 1206, 108 S.Ct. 2849, 101 L.Ed.2d 886. The plaintiff must demonstrate, with convincing clarity, that the defendant published the defamatory statement either "with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity." *Id.* at paragraph one of the syllabus. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267.

In order to withstand a defendant's motion for summary judgment in a libel action, a public figure must produce sufficient evidence to raise a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 254–256, 106 S.Ct. 2505, 2512–2513, 91 L.Ed.2d 202, 215–217; *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 218, 520 N.E.2d 198, 201–202, certiorari denied (1988), 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148. However, the requirement that the clear and convincing standard of proof should be taken into account in ruling on a motion for summary judgment in defamation cases does not "authorize trial on affidavits." The weighing of the evidence and the drawing of legitimate inferences from the facts are functions of the jury, not those of a judge in ruling on a motion for summary judgment. *Anderson, supra,* at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216.

Appellant first argues that he is not a public figure and therefore the actual malice standard does not apply. Public figures are those individuals who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz, supra,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

" * * * In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume social prominence in the resolution of public questions." *Id.* at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

The issue of whether the plaintiff is a public figure is a question of law for the court to decide. *Rebozo v. The Washington Post Co.* (C.A.5, 1981), 637 F.2d 375, 379, certiorari denied (1981), 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379; *Hotchner v. Castillo–Puche* (S.D.N.Y.1975), 404 F.Supp. 1041, 1045.

In finding that appellant was a public figure, the trial court stated:

"The Court hereby holds that Plaintiff is a public figure. He has participated in local party politics for a number of years and has supported the anti-abortion cause through party politics and legal representation of other anti-abortion supporters locally. While plaintiff suggests he is not a public figure by virtue of being a neighborhood precinct executive or a central committee chairman, or by virtue of his involvement in the Cincinnatus Party and Platform Republicans, he fails to recognize the cumulative effect of being involved in all these activities in addition to being a prominent figure in the anti-abortion cause, a substantial

public controversy or question into which plaintiff has voluntarily injected himself."

We agree with the trial court's analysis. Appellant's representation of the Cincinnatus Party and anti-abortion protesters would not alone make him a public figure, see *Gertz, supra.* However, appellant is a fairly well-known figure in local pro-life circles. He ran for chairman of the Hamilton County Republican Party in 1988 and 1990, and he became part of a public battle for the control of the direction that the local Republican Party would take. An individual who decides to seek public office "must accept certain necessary consequences of that involvement in public affairs." That individual "runs the risk that closer public scrutiny than might otherwise be the case." *Gertz, supra,* 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 807–808. Appellant has voluntarily injected himself into the public and controversial debate over abortion and has therefore become a limited public figure for the purpose of this litigation. See *Mastandrea v. Lorain Journal Co.* (1989), 65 Ohio App.3d 221, 224–225, 583 N.E.2d 984, 986–987, certiorari denied (1990), 498 U.S. 822, 111 S.Ct. 73, 112 L.Ed.2d 46; *Maxwell v. Henry* (S.D.Tex.1993), 815 F.Supp. 213, 215.

■ Although we find appellant to be a public figure, we conclude he presented sufficient evidence of actual malice to overcome a motion for summary judgment. Construing the evidence most strongly in appellant's favor, *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216, we find that it shows that the only support offered by Dennis Nichols for the proposition that appellant had been shunned by pro-life groups was the Wilkes' statements regarding the Cincinnatus Party in the late 1970s and early 1980s. Nichols did not speak to any pro-life group or individual prior to writing his editorials. He even conceded, "I don't think anyone has taken issue with James Condit, Sr. being a responsible pro-lifer, I certainly haven't."

Likewise, Nichols' only evidence that appellant is anti-Semitic is appellant's failure to publicly repudiate his son's alleged anti-Semitic comments and his continued support of the Cincinnatus Party. Nichols admitted that he did not contact appellant prior to writing his editorials, that he had never spoken to appellant about appellant's personal beliefs, and that he could not recall any public comment by appellant. Appellant's evidence, if believed, demonstrates that he supported the Cincinnatus Party because of its strong stand on abortion and other issues. However, appellant's views and the views of his son were not necessarily the same on every issue, and his son acted independently. In fact, Condit, Jr.'s controversial speech was made during a non-election year when neither he nor any other member of the Cincinnatus Party was running for office. Yet, appellees republished the allegation that appellant is anti-Semitic after the

suit was filed, even though discovery showed that appellant had a minimal role in the Cincinnatus Party, that he denied any knowledge of the anti-Semitic publications allegedly being distributed by his son, that he felt his son's comments in the 1986 speech were misunderstood, and that he has friends and clients who are Jewish.

The issue of actual malice calls into question the defendant's state of mind. It does not readily lend itself to summary disposition. *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 120, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411, 421–422, fn. 9; *Rebozo, supra,* 637 F.2d at 380–381. Appellant's evidence, if believed, shows more than a mere failure to investigate; it supports the inference that appellees acted in reckless disregard of the truth. See *Varanese, supra,* 35 Ohio St.3d at 80–81, 518 N.E.2d at 1180–1182. Reasonable minds could differ as to whether appellant demonstrated actual malice with convincing clarity, and there are issues of fact which a jury must be permitted to decide. See *Hotchner, supra,* 404 F.Supp. at 1049. Accordingly, we conclude that the trial court erred in granting summary judgment in favor of appellees. We sustain appellant's assignments of error, and we remand the matter for trial.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, reversed and this cause is remanded for further proceedings according to law and not inconsistent with this decision.

*Judgment reversed*
*and cause remanded.*

JONES, P.J., KOEHLER and WALSH, JJ., concur.