OPINION
Milton Wilkes appeals from a judgment of the Montgomery County Court of Common Pleas which determined the stock ownership of Urban Communications Television, Inc. ("UCT") and from a judgment which denied his Civ.R. 60(B) motion.
The testimony and exhibits from the trial reveal the following. In 1993, Wilkes organized UCT to establish and operate a low power television station, WUCT-TV51 ("the station"), in Dayton, Ohio. He filed the articles of incorporation in December 1993 and caused a certificate for 345 shares of stock to be issued to himself. The articles of incorporation indicated that the corporation was authorized to have 750 shares of stock outstanding.
Wilkes obtained a license to operate the station from the Federal Communications Commission ("FCC") on August 21, 1995. The FCC license was issued in the licensee name, "URBAN COMMUNICATIONS TV, INC." Wilkes later asked the FCC to change the name of the licensee on the license to reflect the name of the buyer on the purchase agreement through which the license had been purchased. The FCC issued another license, pursuant to Wilkes' request, in the licensee name, "Milton Wilkes aka Urban Communications Television, Inc."
To finance the acquisition of the license, purchase necessary equipment, and pay operating expenses, Wilkes approached several potential investors, including James Price, Dr. Philip Duncan, LaVerne Gooding, and Daniel Campbell. He promised these investors that they would get shares of stock in UCT in exchange for their investments. Some stock certificates were issued to early investors, but the accuracy of those certificates was disputed. Stock certificates were not issued to later investors. Some of the investors also signed personal guarantees for loans and leases for the station. They testified that at the time they had signed the documents, they had not known that they had been signing personal guarantees. These loans and leases totaled over $200,000 and were in default at the time of trial.
The early investors continued to give money to the station to pay operating expenses, believing either that they were giving UCT a loan or that they were receiving additional stock for their contributions. Wilkes also solicited further investors, including Jesse Gooding, LaVerne Gooding's husband ("Gooding"), Prentice Alexander, and Allen Stephens, with the promise that they would receive stock for their contributions. Although many of these investors testified that they had given various amounts to UCT and exhibits were introduced to prove that certain sums had been given, exact figures of the amounts that had been given were not established. Further, the value of the "sweat equity" which some investors testified they had given to UCT was not established.
In 1995, Alexander, a Certified Public Accountant, began investing in UCT and providing UCT with managerial accounting services. In July 1995, Alexander began raising questions among the investors about how much each had contributed and how much stock each believed he owned.
On September 4, 1995, the investors held a meeting. Minutes of this meeting were taken by Alexander and were ratified at a subsequent meeting. At this meeting, Wilkes, Alexander, Duncan and Gooding agreed that each person's investment would be capitalized at $5,000 based on the work and services that he had previously performed. The remainders of the amounts of monies given by the investors were deemed to be loans to UCT. Gooding and Duncan each testified that an agreement was reached during this meeting that, with the exception of Campbell, all the investors held equal shares of stock. The number of such shares, however, was not determined. Price testified that Wilkes had not voiced any objection to this agreement. Wilkes testified that, although the investors had discussed an equal division of the shares at this meeting, they had not reached an agreement on the subject.
The minutes from a January 13, 1996 meeting reflect that, during the meeting, Gooding asked how the stock was distributed and Alexander answered that: Campbell had 10 shares, Wilkes had 148 shares, Price had 148 shares, Gooding had 148 shares, Duncan had 148 shares, and Alexander had 148 shares. There is no evidence that these minutes were approved at a subsequent meeting. Alexander testified, however, that the minutes accurately reflected what had occurred at that meeting.
Confusion surrounding the stock ownership continued following the January 1996 meeting. Wilkes raised the issue again through his attorney, Charles Smiley, Jr. In March 1996, the investors held a meeting with Smiley to discuss the stock ownership. No minutes of the March 1996 meeting were taken. Alexander testified, however, that he had tape recorded the meeting in its entirety.
Duncan testified that the following were present at this meeting: Wilkes, Gooding, Alexander, Price, and himself. Gooding, Price, and Duncan each testified that, at the meeting, the investors agreed that each stock holder was to receive 148 shares of stock, with the exception of Campbell, who was to receive 10 shares. Alexander testified that the investors had also agreed that Allen Stephens was to receive 148 shares of UCT stock. Stephens had started investing in UCT in March 1996. The investors apparently realized that the addition of 148 shares for Stephens would put the number of outstanding shares in UCT beyond the 750 shares authorized in the articles of incorporation because Alexander testified that they had planned to attempt to obtain more shares from the "Secretary of State." Gooding and Price testified that Wilkes had not objected to the investors' agreement. Price testified that, following the meeting, Smiley was to prepare a document to reflect this agreement.
Wilkes disputed that the above agreement had been made. He testified that, in July 1995, he and Alexander had verbally agreed that, before Wilkes would transfer some of his 345 shares to allow for equal ownership among the shareholders, Alexander would pay him $10,000.
Alexander testified that, during the March 1996 meeting, the investors had agreed to meet again in April, at which time each would bring verification to prove the amount of his monies or sweat equity that he had given to UCT. Before that meeting, Wilkes filed a petition under Chapter 13 of the United States Bankruptcy Code. In that petition, he claimed that he owned 345 shares of UCT stock. Throughout the trial, Wilkes also argued that he owned the FCC license for the station.
On June 7, 1996, the United States Bankruptcy Court, Southern District of Ohio, Western Division, granted a motion for relief from the "automatic stay" that had been placed on all proceedings against Wilkes pursuant to the United States Bankruptcy Code.
In August 1996, Alexander and Gooding filed a complaint against Wilkes and UCT, among others. The complaint asked the court to, inter alia, hold a hearing to determine the ownership interests of the investors in UCT.
On October 21, 1996, the trial court issued a temporary order stating that "immediate and irreparable injury, loss or damage will result unless the Court intervenes[,]" removed Wilkes from his position as general manager of the station, and appointed an escrow agent to manage the station. On the same day, the trial court issued a temporary restraining order stating that good cause had been shown to enjoin and restrain Wilkes from harassing any of the shareholders and from entering onto the station premises.
A trial was held August 14, 18, 19, 20, 1997. On August 22, 1997, the trial court issued its decision and order. The trial court found that, "[o]n September 5, 1995, the parties made an agreement, supported by their mutual promise to each other to limit or reduce their capital stock account at $5,000.00 each, to divide the shares of the corporation equally, at 148 shares each, with 10 for Mr. Campbell. The agreement did not include any additional payment of $10,000.00 from Mr. Alexander to Mr. Wilkes or to U.C.T."[1] The trial court also concluded that the FCC license for the station was the property of UCT.
On April 15, 1999, the trial court overruled Wilkes' motion for relief from judgment pursuant to Civ.R. 60(B). Wilkes now appeals the trial court's August 22, 1997 decision regarding the stock ownership and the April 15, 1999 decision overruling his Civ.R. 60(B) motion.
Wilkes advances six assignments of error on appeal.
 I. THE TRIAL COURT ERRED IN RULING ON THE OWNERSHIP OF THE TELEVISION BROADCAST LICENSE USED BY WUCT-TV51.
Wilkes argues that the trial court did not have subject matter jurisdiction to determine the ownership of the broadcast license because the bankruptcy court's order gave the trial court authority to determine only the stock ownership of UCT.
The bankruptcy court's order stated, in part, as follows:
 [T]he movants are authorized to commence under State Law proceedings to obtain a court order determining the stock ownership of Milton J. Wilkes in stock of Urban Communications Television, Inc., to determine the value of such stock, to require the issuance, cancellation, or transfer of such stock and its value; and, further, to obtain a court order that determines [Wilkes'] interest in any property of the estate * * * specifically including postpetition earnings and any other funds related to Urban Communications Television, Inc.
(Emphasis sic.)
Based upon the language of this entry, we believe that the trial court did have jurisdiction to determine the stock ownership of the license. The bankruptcy court stated that the trial court was authorized to determine Wilkes' interest in any property of the estate, which would include not only his ownership interest in UCT, but also whether ownership of the license belonged to him or to UCT. Thus, we believe the trial court properly concluded that it had jurisdiction to determine ownership of the license.
Furthermore, the evidence supports the trial court's decision that the license belonged to UCT. The name of the licensee on the original FCC license was "URBAN COMMUNICATIONS TV, INC." The second license that was issued, at Wilkes' request, listed "Milton Wilkes aka Urban Communications Television, Inc." as the name of the licensee. Wilkes apparently was not concerned with the name of the licensee on the original license until after this litigation began, because he testified that he had not asked the FCC to change the name of the licensee until April or May 1997. Wilkes also testified that the money which had been used to purchase the license had come from UCT's checking account.
Wilkes further argues that pursuant to 47 U.S.C. § 310(d), the trial court did not have jurisdiction to determine ownership of the FCC license.
Section 310(d) states, in part:
 No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.
This statute discusses the transference, assignment, or disposal of a FCC license. The evidence reveals that the FCC did issue a license for the station. The trial court only determined whether that license was issued to UCT or Wilkes. The trial court did not transfer, assign, or dispose of the license. Thus, we do not believe that the statute was applicable to the trial court's decision.
The first assignment of error is overruled.
 II. THE TRIAL COURT ERRED IN NOT ALLOWING WILKES' DEFENSE ATTORNEY TO WITHDRAW FROM THE CASE DUE TO THE FACT THAT HE OPENLY ADMITTED THAT HE WAS NOT PREPARED FOR TRIAL.
At the beginning of the trial, which was set for 1:30 p.m. on August 14, 1997, the following conversation occurred on the record:
 THE COURT: There was a problem involving representation of one of the parties. If counsel and the party wish to * * * put anything on record concerning that, I will give you the opportunity of doing that. * * *
 MR. EARHART: * * * Scott Earhart for Milton Wilkes. I filed a motion on behalf of myself and Al Weisbrod just before this trial, probably 1:15 today, and moved to withdraw as counsel in this case. I know we have had a lengthy discussion about this in chambers, and I stated my position with you. For the record, there was an agreement made between Mr. Wilkes and Mr. Weisbrod regarding representation and an agreed fee was reached upon, or agreed upon, and over the last few months, Mr. Weisbrod has attempted to contact Mr. Wilkes about the paying the balance of his fees, and we were going to give him until this morning to do it at 11:30. 11:15 today he did come into the office and he brought a check, but there was insufficient funds for that check, and based on that and the fact that we have not had an opportunity to sit down with our client and review and prepare for this matter and communicate as we should, I filed the motion to withdraw, and I understand the Court's position and counsel's position, but our position was that we're not prepared to go forward today in this trial, but understand the Court would like us to, and we're going to do so.
Wilkes argues that the trial court erred in not allowing his attorney to withdraw. He claims that "[i]t is preposterous for anyone to think that [Wilkes] was going to receive a fair trial, after his attorney had filed a motion to withdraw from the case, a few minutes before the start of trial[.]"
Wilkes fails to demonstrate with any specificity how he was damaged as a result of the trial court's denial of his attorney's motion to withdraw. Furthermore, Wilkes seems to have invited this problem by failing to pay his attorney the agreed fee and by failing to maintain contact with his attorney, especially in light of the approaching trial.
The second assignment of error is overruled.
 III. THE TRIAL COURT VIOLATED THE UNITED STATES BANKRUPTCY COURT'S AUTOMATIC STAY.
Wilkes argues that the trial court violated the bankruptcy stay with its temporary order and temporary restraining order which allowed Wilkes to be removed from his position as general manager of the station. He claims that the trial court "had a legal obligation to provide [him with] the same protection as the bankruptcy court" and thus should not have allowed him to be harmed economically.
Alexander and Gooding assert that Wilkes failed to raise any objections to these orders in either the trial court or the bankruptcy court. Wilkes does not dispute this statement in his reply brief. In reviewing the record, we were unable to locate any document which demonstrates that this argument was raised in either the trial court or the bankruptcy court. Because Wilkes failed to raise this issue, we conclude that he waived it.
The third assignment of error is overruled.
 IV. THE TRIAL COURT ERRED IN ITS RULING BY RELYING ON PLAINTIFFS' EXHIBITS #11, #35, AND #39 IN DETERMINING THE STOCK OWNERSHIP IN URBAN COMMUNICATIONS TELEVISION, INC.
Wilkes argues that the trial court erred in admitting Plaintiffs' Exhibits 11, 35, and 39.Plaintiffs' Exhibit 11 was a document titled, "ACTION BY WRITTEN CONSENT OF THE SHAREHOLDERS OF URBAN COMMUNICATION TELEVISION, INC." Gooding testified that this document had been prepared by attorney Smiley and that Smiley had distributed it to the investors following the March 1996 meeting. Gooding stated that the document accurately reflected the actions that the investors had taken at that meeting., Plaintiffs' Exhibit 35 was a document titled, "AGREEMENT OF SHAREHOLDERS[.]" Alexander testified that this document had been prepared by Smiley. He stated that the document accurately reflected the agreement that the investors had made at the March 1996 meeting., Plaintiffs' Exhibit 11 states, in part, as follows:
 RESOLVED, that the remaining shares of stock of [UCT] and certain of the shares of [Wilkes], with his approval, shall be, and hereby are, issued and re-distributed, such that the following distribution shall become and be effective forthwith:
 Milton Wilkes — 148 shares, Daniel Campbell — 10 shares, James Price — 148 shares, Jesse Gooding — 148 shares, Philip Duncan — 148 shares, and Prentice Alexander — 148 shares.
(Emphasis sic.)
The document then stated that a shareholders agreement had been unanimously approved to explain how the shares would be transferred to achieve that distribution. This shareholders agreement was apparently Plaintiffs' Exhibit 35, because Plaintiffs' Exhibit 11 then went on to discuss the contents of the shareholders agreement and those contents match the contents of Plaintiffs' Exhibit 35. Wilkes raised an objection to the admission of these documents at trial.
Wilkes argues that these documents were not properly authenticated because they were not dated and were not signed by the parties listed on the documents as signatories. He also claims that because Smiley did not testify that he had prepared them, they "could have been written by anybody in America."
Evid.R. 901(A) states "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A document may be authenticated by having a witness with knowledge testify that the document is what it is claimed to be. Evid.R. 901(B)(1). "The evidence necessary to support a finding that the document is what a party claims it to be has a very low threshold, which is less demanding than the preponderance of the evidence." Burns v.May (Apr. 5, 1999), Clermont App. No. CA98-06-046, unreported. "Any firsthand knowledge of a writing, however acquired, is an appropriate basis for testimony on the issue of authentication where the testimony logically connects the documents with the issues of the case." Bross v. Smith (1992), 80 Ohio App.3d 246,251, 608 N.E.2d 1175, 1179, motion to certify the record denied (1992), 65 Ohio St.3d 1431, 600 N.E.2d 676, certiorari denied (1993), 508 U.S. 909, 113 S.Ct. 2340 (quotation omitted). Further, the Rules of Evidence do not mandate that proof of authorship is required before a document can be admitted into evidence. Id. at 252, 608 N.E.2d at 1179.
Gooding testified that he had read Plaintiffs' Exhibit 11. Alexander testified that he had reviewed Plaintiffs' Exhibit 35. Thus, both had firsthand knowledge of the documents and their contents. Both testified that the documents reflected the investors' agreement that had been reached at the March 1996 meeting. Thus, their testimonies logically connected the documents with an issue of the case, i.e., what the investors had agreed with regard to the division of the stock. Moreover, Gooding, Price, and Duncan each described the agreement reached by the investors at the March 1996 meeting and their descriptions matched the listings of the stock ownership in these documents. Thus, the trial court properly concluded that the documents had been authenticated., Plaintiffs' Exhibit 39 was a mini cassette tape. There was some confusion surrounding that tape and another tape at trial. While Alexander was testifying, a tape was introduced, but Alexander testified that it was not the tape he had used to record the March meeting because the tape he had used had been green and this tape was apparently not green. Further, Wilkes' attorney objected to this tape, arguing that it contained only a small portion of the March 1996 meeting and that because such tape had included discussion from attorney Smiley, it was privileged under the work product doctrine. This tape was not offered into evidence.
Later, a tape with a green label was introduced. Alexander testified that it was the tape that he had used to record the March meeting, that he had listened to that tape, and that it was a fair and accurate representation of what had happened at that meeting. This latter tape was marked as Plaintiffs' Exhibit 39. Alexander testified that he had created Plaintiffs' Exhibit 39 by tape recording the entire March 1996 meeting, stopping the tape only to turn it over.
While Alexander was on the witness stand, Plaintiffs' Exhibit 39 was played for the court. Following Alexander's testimony and the playing of the tape, Wilkes' attorney did not cross examine Alexander. When Plaintiffs' Exhibit 39 was offered into evidence, Wilkes' attorney did not object to its admission.
Evid.R. 103 addresses rulings on evidence and states, in part, as follows:
 (A) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]
(Emphasis sic.)
Because Wilkes' failed to object to the admission of Plaintiffs' Exhibit 39, he waived any argument regarding it.
The fourth assignment of error is overruled.
 V. THE TRIAL COURT ERRED IN NOT RECUSING ITSELF FROM HEARING THIS CASE DUE TO THE [COURT'S 20] YEAR POLITICAL RELATIONSHIP WITH CO-PLAINTIFF, JESSE GOODING.
At the beginning of the trial, the judge stated as follows:
 Now, as I announced to counsel when this case first was assigned to me, I always like to inform people of those parties [that I have known] in the past. I do know Mr. Gooding, and I have known him since the days he was a township trustee in Jefferson [T]ownship, and I was a township trustee in Madison Township. I have not had anything except very infrequent contact with him in the years since and would feel that there is no reason that would cause me to be partial to Mr. Gooding's side of the case either for or against him. I believe I could decide the case regardless of the effect of the case on him.
Neither party objected following the judge's statement.
Wilkes now argues that after the judge made this statement, he asked his attorney to "recuse" the court because he did not believe that the court could be fair and objective, but that his attorney refused. He argues that the trial judge "should have recused himself, without either party requesting [him] to do so."
"The Chief Justice of the Supreme Court of Ohio, or his designee, has exclusive jurisdiction to determine a claim that a common pleas judge is biased or prejudiced." Jones v. Billingham
(1995), 105 Ohio App.3d 8, 11, 663 N.E.2d 657, 659, citing Section5(C), Article IV, Ohio Constitution; see R.C. 2701.03. Thus, we will not address this argument.
The fifth assignment of error is overruled.
 VI. THE TRIAL COURT ABUSED ITS DISCRETION IN ITS 60(b) MOTION RULING.
Wilkes argues that the trial court abused its discretion when it denied his motion pursuant to Civ.R. 60(B). He argues that "[a] review of the testimony from the 60(B) motion hearing * * * clearly shows" that one of the trial court witnesses committed perjury.
There is no transcript from the Civ.R. 60(B) hearing in the record. App.R. 9(B) states, in part:
 At the time of filing the notice of appeal the appellant, in writing, shall order from the reporter a complete transcript * * * as the appellant considers necessary for inclusion in the record and file a copy of the order with the clerk.
App.R. 10(A) states, in part:
 After filing the notice of appeal the appellant shall comply with the provisions of Rule 9(B) and shall take any other action necessary to enable the clerk to assemble and transmit the record.
Loc.R. 6(A) states:
 If a Transcript of Proceedings is to be filed in accordance with Appellate Rule 9(B), a copy of the notice of appeal with praecipe shall be served by the appellant upon the court reporter. The appellant is responsible for contacting and ordering the Transcript of Proceedings from the court reporter and for the filing of such Transcript of Proceedings with the clerk of the Trial Court in accordance with App.R. 9(B). The court reporter shall comply and prepare those portions * * * of the record enumerated in the praecipe, subject to being made secure in the payment of * * * her fees by the party who ordered the * * * transcript.
A review of the record reveals that Wilkes attached a praecipe as the last page of his fourteen-page amended notice of appeal. The praecipe had two paragraphs, with the first asking the clerk of court to prepare the record and the second asking the court reporter to prepare the transcript from, inter alia, the Civ.R. 60(B) hearing. The praecipe was not individually file-stamped.
The rules require that the transcript be ordered from the court reporter and that a copy of such order be filed with the clerk of courts. There is no evidence that Wilkes ordered the transcript from the court reporter or that he had arranged to pay the court reporter for her preparation of the transcript. Filing a praecipe for the court reporter with the clerk of courts, without further action, fails to meet the requirements of the appellate rules.
Further, as the appellant, Wilkes was responsible for assuring that the record before us was complete.
The sixth assignment of error is overruled.
The judgment of the trial court will be affirmed.
FAIN, J. concurs.
[1] The trial court made this finding in the "SPECIFIC FINDINGS" section of its decision. In its "CONCLUSIONS OF LAW[,]" it appears that the trial court inadvertently listed 148 shares for Campbell, instead of 10 shares as it had found earlier.