DAUBENMIRE et al., Appellants,

v.

SOMMERS et al., Appellees.

[Cite as *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 2004-Ohio-914.]

Court of Appeals of Ohio,
Twelfth District, Madison County.

No. CA2003–03–014.

Decided March 1, 2004.

Roy Nichols, for appellants.

Raymond Vasvari, Legal Director, American Civil Liberties Union of Ohio Foundation, Inc., for appellees Robert Sommers II and Pamela Wassmuth.

Falke & Dunphy, LLC, and Patrick K. Dunphy, for appellees D. Steven Allen and Vicijean Geer.

———————

WILLIAM W. YOUNG, Judge.

{¶ 1} Plaintiffs-appellants, David Daubenmire, his wife Michelle, and their three children, appeal from the judgment of the Madison County Court of Common Pleas granting summary judgment in favor of defendants-appellees, D. Steven Allen, Vicijean Geer, Robert Sommers II, and Pamela Wassmuth, in a defamation action. We affirm the judgment of the trial court.

{¶ 2} Appellants' defamation action is based on the claim that appellees, in concert with others, used defamatory means in the spring of 1998 in an attempt to prevent the renewal of David Daubenmire's football coaching contract. Having failed to dissuade the London City School District Board of Education from renewing the contract, appellees then engaged upon a campaign of libel and slander to inflame the community-at-large to force the board to reconsider its decision. The principal protagonists of this affair are the following:

{¶ 3} Appellee D. Steven Allen was the principal of London High School from 1991 to 1998. As such, he reported to Superintendent Jacob F. Froning and to the board; oversaw the day-to-day activities of the high school students, faculty, staff, and athletic coaches; supervised and disciplined faculty, staff, and coaches; and made recommendations to the superintendent and the board on hiring, renewing, and nonrenewing faculty, staff, and coaches. Discipline included issuance of warnings and reprimands, verbal and written, together with placement of disciplinary actions in personnel files maintained in the superintendent's office.

{¶ 4} During Allen's tenure, Daubenmire was London High School head football coach and a special education teacher. Appellee Vicijean Geer was employed by the board for 35 years and was the high school assistant principal from 1984 to 1998. As such, she reported to Allen, the superintendent, and the board; participated in the supervision of the faculty; provided input about hiring, renewing, and nonrenewing faculty; and provided input about discipline. Allen and Geer both supervised Daubenmire.

{¶ 5} Appellee Pamela Wassmuth was the high school nurse and the mother of Daniel, a football player coached by Daubenmire. Appellee Robert Sommers II was a parent of London High School students and a resident of the London

School District who had served on the board from 1989 to 1993. In 1998, he was the spokesperson of an informal group of concerned citizens formed that year and called CARE (Citizens Advocating Responsible Education).

{¶ 6} The chronology of the events giving rise to the defamation claims is as follows: During his tenure as principal, Allen experienced difficulty in working with Daubenmire. Allen believed that Daubenmire was resistant to his authority as principal because of the unique and important position Daubenmire held as head football coach. Although Allen preferred addressing problems informally by discussing them with Daubenmire, Allen did formally warn and/or reprimand Daubenmire several times between 1991 and 1998. Daubenmire was disciplined for allowing two students to leave school early without permission from the administration to buy car parts for his car; for holding intramural basketball games without prior approval from the administration; and for refusing to divulge the names of football players who had admitted to or alluded to using drugs, alcohol, and/or tobacco.

{¶ 7} With regard to the latter, the record shows that, throughout the proceedings, Daubenmire denied that football players had admitted using drugs and/or alcohol. According to Daubenmire, the discovery that the high school drug policy had been violated led to a meeting, during which the players were asked to stand up and say "I'm a man of my word and I'm not going to use alcohol and drugs." Although the topic of the meeting was about tobacco and alcohol use, there was no discussion, no admission, and the players were not asked whether they used those substances. Daubenmire denied looking the other way but admitted he was not interested in whether the players were using those substances. He simply wanted them to be a man of their word.

{¶ 8} In his deposition, Allen testified that he found out about the players' admission from Terry Nance, the high school athletic director. Allen thereafter talked to the coaches, who refused to divulge the names so as not to violate the players' trust. Allen recommended that the coaches be suspended for two games. The coaches, however, were never suspended.

{¶ 9} Between 1991 and 1998, Daubenmire also bypassed the established chain of command on several occasions and failed to timely turn in money from an athletic sale in violation of the school policies. In 1994, Daubenmire received a written warning for mailing letters to local clergy using letterhead, envelopes, and postage provided by the school. Through this mailing, Daubenmire was trying to organize a Promise Keepers breakfast to form a partnership with local clergy to help children in school. In his deposition, Daubenmire described Promise Keepers as an evangelical men's group focused on the role of Christian men in their homes, schools, and communities. Upon being warned, and although

viewing the mailing as related to school business, Daubenmire reimbursed the school district. .

{¶ 10} In 1996, Daubenmire sought and obtained permission from Allen to attend a radio talk show on WCVO in Columbus during school time to discuss "coaching, teaching, from [his] point of view." Although Daubenmire knew that WCVO was a Christian radio station, Allen did not. The show ended up being mostly about faith and Jesus Christ and had very little to do with football. Allen found out about the tone and contents of the show after Robert Sommers and several parents called him about it. Had Allen been told up front that WCVO was a religious station, he would have requested that Daubenmire take a personal day. Allen felt that he had been led to believe that the show was going to represent the school regarding coaching and teaching.

{¶ 11} The record shows that Daubenmire's involvement with religion while coaching football at London High School was not limited to the foregoing two instances. While head football coach, Daubenmire routinely invited clergy to lead prayers in the locker room and on the field before and after the games, and initiated the Lord's Prayer on several occasions. In his deposition, Daubenmire stated that after he became a Christian in 1988, he was solicited to speak to groups about faith. According to Daubenmire, being a Christian means preaching to the world, including on radio and television. Before mid–1998, Daubenmire appeared on the 700 Club, a Christian television program, where he was interviewed about Promise Keepers, as well as on WSFJ, a religious television station, where he and his wife were the features of a one-hour program. Daubenmire also appeared on WSFJ to discuss the issue of separation between church and state. Although Daubenmire was not solicited to speak or appear on those programs as a coach, he agreed that he was likely introduced as London High School head football coach.

{¶ 12} In 1995, the then board president contacted the ACLU because he was concerned that Daubenmire's religious practices would result in a lawsuit against the school district. In 1996, upset that the superintendent ignored the problem, the board president and another board member resigned over the issue. During his tenure as principal, Allen routinely heard rumors and accusations that Daubenmire and his coaching staff engaged in preaching. However, no parent ever complained directly to Allen.

{¶ 13} In January 1998, Charles Spinning, a community member, contacted Allen to complain about a Thursday evening football team dinner he had attended in October 1997. The dinner was described in an affidavit as follows: "I decided to stay in [the] Auditorium for the rest of the program, which I had anticipated would be a pre-game pep talk. I was surprised and could not believe what happened next. * * * Assistant Coach Mark Collier stood up and began a

lecture entitled 'Filling the Breach' which lasted for twenty minutes or more. The theme of the lecture was how the senior class players had failed to step into the breach left by those who had graduated the year before. During his sermon, Mr. Collier alternatively read quotations from two different Bibles. At one point, he slammed a Bible into a student's lap and shouted 'Read the Word, it's in the Book!!' That entire night's program was devoted to Mr. Collier's sermon. * * * After that experience, I spoke with several former and current London High School football players about the religious activities which pervade the football program. I asked each player whether they had the option to walk away when prayers were being said by the football coaches. The answer from all was an emphatic 'NO'."

{¶ 14} In his deposition, Daubenmire admitted that a Bible had been used that evening but stated that the events witnessed by Spinning were "not substantially dissimilar" from events witnessed by Spinning in previous team dinners. Daubenmire asserted that because the Bible was used only for inspirational purposes, it was not improper. Throughout the proceedings below, Daubenmire repeatedly took issue with the allegation that he had violated the First Amendment. According to Daubenmire, one violates the First Amendment only if one has been convicted of violating it in court or if one forces his religious belief on someone. Referring to the Bible during team meetings was simply a life lesson.

{¶ 15} Appellee Pamela Wassmuth had been unsatisfied with the high school athletic program. As a result, she helped organize a meeting on January 28, 1998, between parents, Allen, and Nance, the athletic director. The purpose of the meeting was to provide an opportunity for parents to voice concerns about various aspects of the athletic program, including athlete health and safety. Prior to the meeting, Allen told Wassmuth that the proper protocol required parental complaints to be directed to coaches first and then to the athletic director. Wassmuth told Allen that some parents had unsuccessfully approached coaches while others absolutely refused to meet the coaches, and that the parents did not want the coaches to attend the meeting. Upon being relayed the information, the superintendent directed Allen to bypass the protocol and to have the meeting without the coaches but with the athletic director.

{¶ 16} There was no system of invitation to the meeting other than by word of mouth. A few days before the meeting, Daubenmire and another coach found out about the meeting, reminded Allen of the protocol, and asked that the meeting be cancelled. When Allen refused, they asked to attend. Again, Allen refused. At the meeting, which lasted four and one-half hours, Allen reminded the 50 persons in attendance about the protocol. He then listened to the complaints that pertained to several sports, including football, and which criticized the coaching and treatment of athletes. The meeting was taped by Nance. Although the

coaches were specifically told that they were not allowed to get a tape of the meeting, Daubenmire subsequently asked for and received from Nance the audiotape of the meeting. Daubenmire was reprimanded for obtaining the tape. Some time after the meeting, Allen reviewed the complaints with the coaches individually and told them to address them if they had any validity. Daubenmire categorically denied mistreating players.

{¶ 17} Based upon Daubenmire's refusal to divulge the names of players who had admitted substance abuse, his repeated policy violations, and, to a minor extent, the January 1998 meeting with parents, Allen decided to recommend nonrenewal of Daubenmire's coaching contract. Although Allen was concerned by the preaching allegations surrounding Daubenmire, the religious issue was not a factor in Allen's recommendation not to renew Daubenmire's coaching contract. Allen wanted to inform Daubenmire of his planned recommendation as early as December 1997. However, the superintendent directed him not to until further notice. Allen was finally allowed to tell Daubenmire a few days before the board meeting.

{¶ 18} On April 20, 1998, Allen addressed the board in executive session. Both the superintendent and Geer were excluded from the executive session. In support of his nonrenewal recommendation, Allen used a memorandum he had prepared. It listed discussions and disciplinary measures taken regarding Daubenmire's bypassing the chain of command, using school mailing for the Promise Keepers' breakfast, allowing students to leave school early without administrative permission, attending the religious radio show, refusing to divulge players' names regarding substance-abuse admission, and preaching to the players with his coaching staff. It also referred to a sophomore fundraiser as follows:

{¶ 19} "As part of this fund raiser, the students were selling diet pills. When the students objected, Dave [who was the Sophomore Class Adviser] eliminated this item. When I reviewed this with Dave, I found out that this was also tied to the proposal to the Hartley Board to sell TPN satellite dishes. I discussed this with [the superintendent] who told me that Dave's proposal had been turned down by the Hartley Board. He instructed me to end the sophomore sale. I did. Again, working out there without our knowledge or permission."

{¶ 20} In his deposition, Allen stated that not all the products to be sold were diet pills, that the administration was concerned about the products and the sale's tie to the satellite dishes, and that the sale was over before it even started. Daubenmire denied that diet pills were offered. Rather, products offered were vitamins and skin creams. An herb similar to Olestra that blocks absorption of fat was also talked about but was never offered. Daubenmire also denied working without permission. He had submitted the required form to Geer, who apparently never received it.

{¶ 21} Following its executive session and after hearing from Daubenmire, the board voted to renew his coaching contract. A few days later, the superintendent asked for and received a copy of Allen's memorandum. Without Allen's or Daubenmire's knowledge, the memorandum was later placed in Daubenmire's personnel file. Faced with the board's rejection of his recommendation, Allen decided to resign as principal at the end of the school year.

{¶ 22} Sometime after the board's decision to renew Daubenmire's coaching contract, Robert Sommers's wife came home and told him about Allen's decision. Sommers thought that a public discussion was needed, as the board did not seem to understand the gravity of the situation.

{¶ 23} Sommers arranged for a community meeting at a Methodist church on April 26, 1998. There was no system of invitation to the meeting other than by word of mouth. Concerns were raised about misuse of funds, prayers, proselytizing, and religious heavy-handedness in general, students' health, and the fact that coaches turned a blind eye to drug use. Sommers conducted a second community meeting two days later. Its purpose was to gather more information and allow more community members to attend and tell about their experience with Daubenmire and why they supported Allen. Although not invited by Sommers, board members, the superintendent, and Daubenmire were present at the second meeting. Grievances were reduced to writing and handed out. Concerns were raised about the board's decision to retain Daubenmire as coach and the likelihood that Allen would resign.

{¶ 24} During that meeting, Sommers talked to Daubenmire, who stated that this was the first time he had heard of any of the complaints. Feeling threatened by Daubenmire's mannerisms, use of words, and innuendo during their conversation, Sommers wrote him a letter on May 2, 1998. The letter, which was carbon copied to the board, the superintendent, Allen, and another school official, stated that "I was disappointed with your reactions at Monday's community meeting. You had a real opportunity to join a healing process for a wounded high school and community but you chose to be aloof and threatening.

{¶ 25} "Your comments to me after the meeting clearly indicate you are not interested in working with your fellow faculty and the London administration to resolve the rift at the high school. Frankly, I was appalled at your comments against [the superintendent], Mr. Allen, the high school faculty, and the parents present at the meeting. You showed no compassion for the problems they face and you clearly don't understand the impact your actions have on the health of the school.

{¶ 26} "I did check on your statement, that 'Steve Allen hasn't met with me on these issues for 7 years.' I verified from multiple, independent sources that Mr. Allen and [the superintendent] have met with you on several occasions to discuss

the problems you are having with faculty and parents. What respect I had for you as an individual was irreparably damaged by your willingness to falsify information to denigrate your fellow educators.

{¶ 27} "On a personal note, your threatening behavior toward me after the meeting was the most un-Christian experience I've had in many years. I hope your comments and your actions were only the result of the stress of the moment. Regardless, I will be checking regularly on your interactions with my children. I will not tolerate any retribution you may enact on them for my efforts to work with the community to solve the high school's problems.

{¶ 28} "I don't profess to fully understand how London High School got into the trouble we find it today. But I do know your unwillingness to participate in the healing process will assure continuing problems. I encourage you to reconsider your approach to the faculty, the administration, and to the community. If you can't, I encourage you to seek employment in another school district. Let our community heal and our children learn."

{¶ 29} In the aftermath of the board's decision to renew Daubenmire's coaching contract, the superintendent suggested that Allen present Daubenmire with a mandatory improvement plan. Allen did so on May 13, 1998. The plan, which was handwritten by the superintendent but typed by Allen, was placed in Daubenmire's personnel file. It was not given to the board. Addressing Daubenmire's job performance as head football coach, the plan forbade him to proselytize to students through the use of scriptures, use team dinners and other meetings to espouse religious philosophy or biblical teachings, and promote his own personal religious agenda as head football coach.

{¶ 30} The plan also directed Daubenmire to, inter alia, (1) treat students with respect and dignity; (2) fully comply with London School District policies and London High School procedures, rules, and regulations; (3) address student athlete health and safety issues; and (4) cooperate and communicate with the principal and other administrators, which included following administrative directives and the chain of command. Daubenmire refused to sign the plan. Instead, he wrote: "I choose not to sign this document until I've had the chance to seek legal council [sic]. I agree that Mr. Allen reviewed the plan, but this does *not* represent my agreement with the plan."

{¶ 31} On May 18, 1998, Geer addressed the board in executive session and questioned its failure to follow Allen's recommendation regarding nonrenewal of Daubenmire's coaching contract. Geer expressed her concerns about Daubenmire: "My concern with Mr. Daubenmire is that he tries to operate outside the organization. Maybe even above the organization. * * * Mr. Daubenmire has tried to impair the success of our organization by undermining efforts to build a

more effective school. At times he has ignored routine procedures and policies. Another attempt to operate outside the organizational structure.

{¶ 32} "* * *

{¶ 33} "* * * I wanted to tell you if I had been allowed to speak earlier that the situation with Mr. Daubenmire's contract was not about football's success or failure. It was about what direction we want to see London High School go. Do we want to return to the time when football was king at the expense of anything else? * * * Mr. Daubenmire has for a long time been an obstacle along our road to success. I believe he thinks that if he isn't viewed by staff and students as being the heart and center of LHS that he cannot join together with the majority of the staff to create the best environment for our students. * * *"

{¶ 34} In her presentation to the board, Geer cited two examples of Daubenmire's not following procedure. One involved Daubenmire's removal of disruptive students from class without followup; the other involved his removal of students from one building to another without going through proper channels. Geer also expressed concerns about Daubenmire's apparent ambivalence toward the high school drug policy, stating that "giving lip service to caring and helping and really doing it are two very different things."

{¶ 35} That same day, Alan Shellhause also addressed the board in open session. He explained that several months before, his daughter, who was the sophomore class vice-president, was in a quandary as to products offered for the sophomore fundraiser. According to Shellhause, "Several of the products on the brochure that [Daubenmire] was proposing to sell were diet and performance enhancing pills or drinks. The pills, as the brochure stated could be sold in bulk in order to increase revenue, and claimed to be a stimulant which works by increasing the metabolism of the user. * * * I do not think that [Daubenmire] was intentionally or grossly disregarding the school drug policy. Nor do I think that he was acting in total ignorance of the policy when he made this proposal to the Sophomore class officers. * * * Rather, I think that there is a continual ambivalence towards this critical policy within our school system by [Daubenmire]. * * *"

{¶ 36} By June 1998, CARE had been formed. Neither Allen nor Pamela Wassmuth was ever involved with CARE. Geer became involved with CARE after her resignation, "very late * * * and not very much." Sommers became CARE's spokesperson. Originally, the primary objective of CARE was to retain Allen as principal. However, as Sommers explained in his deposition, "CARE would have viewed the elimination of [Daubenmire's] contract as a legitimate need if that is what it took to keep [Allen] as principal." Sommers acknowledged that there were individuals within and outside of CARE who simply wanted Daubenmire terminated as football coach. Eventually, differences between Allen

and Daubenmire were such that terminating Daubenmire's coaching contract became a goal as the only way to retain Allen.

{¶ 37} On June 15, 1998, Sommers addressed the board on behalf of CARE, setting forth its purpose and agenda: "The group is committed to meeting regularly, raising cash, hiring legal council [sic], and communicating with you, the press and the community until these difficult issues surrounding Dave Daubenmire's continued employment are resolved.  * * * There have been repeated allegations that Dave Daubenmire has (1) sold performance enhancing drugs and has encouraged students to do so as a fundraiser, (2) engaged in aggressive religious activities on school time without the permission or support of parents whose children were involved, (3) operated outside of administrative expectations and policies and has done so with impunity, and (4) operated outside of this school board's policies."

{¶ 38} On June 18, 1998, Daubenmire challenged and rebutted CARE's contentions in a front-page article in The Madison Press.  Daubenmire denied forcing his religious beliefs on any student-athlete, stating, "I find it ironic in these days when students are taking guns to school that people find my faith in God to be a greater threat."

{¶ 39} On July 8, 1998, a meeting was held between the superintendent, Sommers, Allen, two football coaches, Jim Roddy, and Daubenmire to give the latter an opportunity to discuss the allegations surrounding him.  Rather than minimizing differences between the participants, the meeting exacerbated them and degenerated into charges and countercharges.  As noted by the trial court, Daubenmire "admitted bits and pieces but took issue with the general tone of the complaints because he did not believe that they had systematically been brought to his attention during his tenure."

{¶ 40} During the meeting, Daubenmire admitted (1) showing "Jesus of Nazareth," "Schindler's List," and "Malcolm X" during class, (2) reciting the Lord's Prayer with the football team, and reading scriptures and using the Bible at some team meetings, (3) having pastors in the locker room to pray before games, (4) being confronted in the past by Allen on issues of conduct, and (5) stating in a newspaper article that there were fewer football players because of the school drug policy.  Daubenmire denied that players ever admitted to using drugs or alcohol, and denied trying to sell diet pills for the sophomore fundraiser.

{¶ 41} On July 13, 1998, Allen and Geer both resigned.  That same day, Sommers, on behalf of CARE, requested intervention by the ACLU "to thwart religious teaching and coaching in our public school system."  The purpose of the letter was to "ask the ACLU for help in * * * what we thought was a serious problem of aggressive fundamentalist teachings within the school system by Dave Daubenmire and his coaches."  Once Allen was gone, Daubenmire's coaching

contract was of no interest to Sommers. The letter to ACLU resulted in a settlement with the board in October 1999. *Bennett v. London City School Dist. Bd. of Edn.* (S.D.Ohio 1999), No. C2–99–601.

{¶ 42} On August 14, 1998, an article published by The Madison Press outlined a series of letters written by Daubenmire's attorney, warning the superintendent, Allen, Geer, and Sommers that public comments about Daubenmire may have defamed his character. The letter to Sommers also warned him to stop making allegedly false statements or face a civil lawsuit for libel and slander. A letter was also sent to the American Center for Law and Justice, a "nonprofit public interest law firm and educational organization * * * committed to the defense of Judeo–Christian values and causes that are pro-life, pro-family and pro-liberty."

{¶ 43} The article stated that "Geer said she has made no public statement regarding Daubenmire's character although she does agree with comments made by some who criticize his teaching and coaching methods." According to the article, "Sommers also denies attacking Daubenmire's character * * *. Sommers said CARE has merely raised questions about Daubenmire's teaching methods and circumstances surrounding an April 20 school board vote to rehire the coach over the objections of [the superintendent] and Allen."

{¶ 44} The same edition of The Madison Press published a letter signed by over 40 persons, including Sommers and Geer, and entitled "CARE members explain position." Its purpose was to clear up criticism that CARE opposed religion. The letter also articulated each member's concerns about Daubenmire's teaching and coaching practices: "Parents' rights, not the Lord's Prayer, is [sic] the real issue surrounding CARE's concerns about several coaches', including Dave Daubenmire's, religious activities and the London School Board's inactions.

{¶ 45} "* * *

{¶ 46} "We believe parents have the right to expect public school officials to teach their children how to read, write and compute. * * * [W]e see no connection between academic instruction and Dave Daubenmire's showing: Jesus of Nazareth, * * * Malcolm X, * * * and Schindler's List * * *.

{¶ 47} "* * *

{¶ 48} "The board's decision to rehire Mr. Daubenmire was an indication that they were in full support of the coach and willing to sacrifice the positive influence and leadership of the principal, Steve Allen.

{¶ 49} "It was with that decision that many issues regarding Dave Daubenmire's activities became apparent to those who were concerned with what had occurred.

{¶ 50} "The CARE group unsuccessfully requested the London School Board to do an impartial, third party investigation of wrongdoing surrounding Dave Daubenmire. The board was completely unresponsive. Contacting the ACLU was a last resort.

{¶ 51} "While we defend Dave Daubenmire's right to his private religious views, many Christians among us find his interpretation of the Bible and his views about Christianity to be extreme. His Christianity is not the Christianity we feel in our hearts or practice in our churches."

{¶ 52} On August 20, 1998, an article in The Madison Press reported that the superintendent had "investigated the charges and found that there was no evidence Daubenmire engaged in 'constitutionally suspect activities' while teaching or coaching. * * * The lone exception to [the superintendent's] findings was confirmation that Daubenmire led team prayers on game nights and at Thursday pre-game dinners—an apparent violation of state law. * * * Other charges that Daubenmire proselytized to players and students, encouraged them to attend his church and impermissibly used religious-based materials in class, were unsubstantiated, [the superintendent] said."

{¶ 53} Three days later, Daubenmire was pictured on the front page of the Columbus Dispatch sports section wearing a London football cap and holding a Bible in one hand and a playbook in the other in conjunction with an article entitled "Is Prayer Fair Game?" The article reflected the view of several coaches, including Daubenmire, of the value of prayer in high school athletics. Daubenmire was quoted: "Many people feel that (prayer) is an important part of their personal life and education as well, and shouldn't be infringed upon * * *. It's a real dilemma. What if one person doesn't want to pray and 50 do? Whose rights are infringing on the others? What about the other 49? It's terrible to try to force someone to pray, but I think out of respect it's not hard to bow your head in a moment of silence." Daubenmire testified that he voluntarily posed, knowing that the article was about the issue of school prayer.

{¶ 54} On September 5, 1998, the Columbus Dispatch published an article entitled "London Coach has a history of Pushing God." The article reviewed documents contained in Daubenmire's personnel file, and in particular Allen's April 20 memorandum to the board. The article detailed, at times verbatim from Allen's memorandum, complaints received about and disciplinary measures taken against Daubenmire: "District administrators received complaints during the past several years that Daubenmire and members of his coaching staff were 'preaching to the players, speaking in tongues, laying on of hands for healing and generally pushing their religious philosophies on the kids,' former principal Steve Allen said in an April report to the school board[.] There also were a number of complaints from parents and district staff that he mistreated some players; made

inappropriate comments; practiced favoritism toward certain players; refused to acknowledge injuries; and, as head coach, gave no direction to middle-school coaches, Allen said in the same report."

{¶ 55} Allen denied putting the April 20 memorandum in Daubenmire's personnel file. Allen did give a copy to the board members and the superintendent. Allen also denied providing the information contained in the article to the reporter or directing the reporter to look into Daubenmire's personnel file.

{¶ 56} As noted earlier, Pamela Wassmuth's dissatisfaction with the high school athletic program led to the January 1998 meeting between parents and Allen. In September 1998, Wassmuth wrote a letter to the new high school principal and to the superintendent. Wassmuth's letter to the new high school principal detailed her son Daniel's experience with the football team, his playing time as a putative quarterback, and her opinions about Daubenmire's attitudes and coaching practices. Her letter to the superintendent outlined the history of relevant events, reflected the views and concerns of other parents and citizens regarding the football program, and expressed her opinions concerning Daubenmire's attitudes and coaching practices.

{¶ 57} On November 13, 1998, The Madison Press published a letter signed by Sommers, Geer, and a pastor, presented on behalf of CARE's members and entitled "CARE's Actions are a Response to Board's Inaction." The letter was published among eight other letters opposing CARE's public position and demands on the board. The majority of the letter was in response to the unexpected and unauthorized publication in The Madison Press of communications CARE had had with the board, including CARE's ten points that were to be presented to the board in an attempt to resolve the issues dividing the community. The letter ended as follows:

{¶ 58} "* * * [W]e believe that the board of education owes the community and the children of the school system, past and present, an apology for its inaction when they knew there was documented evidence of the following problems regarding Mr. Daubenmire: First Amendment violations; mistreatment of students; failure to follow London City School District policies; disregard of student health and safety issues; [and] lack of cooperation and communication with administration. Despite these facts, the members of the board have chosen to keep him as the football coach."

{¶ 59} On December 21, 1998, Allen wrote a letter to the superintendent and to the board members explaining how the board's April 1998 decision to renew Daubenmire's coaching had caused him to resign. Allen also clarified his position regarding Daubenmire's religious conduct: "You know, as well as I, that neither I nor [the superintendent] had major concerns about Dave's crossing the line with his religion. He did, we addressed it, and we were not aware of some of the

accusations that have surfaced since. Although he has successfully manipulated the media, you know that until the need arose for an improvement plan, I never once told him or advised him not to pray before or after games. That has never been an issue. What a shame that it has become the only issue associated with this sordid episode."

{¶ 60} CARE was terminated in January 1999. On January 22, 1999, The Madison Press published a guest column by Sommers in which he set forth CARE's origins, observations, and accomplishments. While the guest column dealt mostly with problems beyond the football program, it did list several problems specific to the football program: "Undisputed facts CARE discovered about Dave Daubenmire and other football coaches include misuse of public funds, frequent violations of school policy, Biblical instruction during school time, opposition to the current and highly praised drug policy, and Dave's refusal to accept his mandatory improvement plan."

{¶ 61} In November 1999, The Madison Press carried an interview of Allen entitled "Allen Speaks on ACLU Suit." The article was written after the ACLU settled with the board. In an introduction to the interview, the article noted that "[t]hroughout the controversy Allen elected not to comment to the press, citing the on-going litigation and a desire not to inflame the issue. But a few weeks ago, Allen sat down with The Madison Press for a frank discussion of the last year's events."

{¶ 62} In the interview, Allen noted that although not a plaintiff in the ACLU suit, he was pleased with the settlement as the overall objective of the lawsuit, stopping religious activity by coaches, had been met. Allen also stated that his recommendation not to renew Daubenmire's contract was based upon Daubenmire's documented pattern of insubordination over the years: "This has never been about getting prayer out of school. We need more prayer in school. * * * But as a member of a government entity, we (faculty) cannot tell kids where to pray, how to pray and when to pray." Allen further stated that "I thought that if he wasn't the football coach, the whole situation would be more manageable. * * * I tried to work with him and to reason with him. But nothing worked: I came to the conclusion that he couldn't be worked with."

{¶ 63} On June 3, 1999, appellants filed a complaint against appellees and five other defendants, alleging defamation. The complaint was voluntarily dismissed on July 21, 2000. On July 18, 2001, appellants filed a complaint against appellees and Charles Spinning, again alleging defamation. Appellants asserted that appellees had defamed Daubenmire by claiming that he misused public funds, violated the First Amendment, mistreated students, disregarded students' health and safety, sold performance-enhancing drugs, frequently violated school policies,

refused to accept a mandatory improvement plan placed in his personnel file, and opposed the high school drug policy.

{¶ 64} Specifically, appellants asserted that Allen defamed Daubenmire by (1) his statements to the board on April 20, 1998, as set forth in his memorandum; (2) placing the mandatory improvement plan in Daubenmire's personnel file; (3) the Columbus Dispatch's September 5, 1998 article; (4) his December 21, 1998 letter to the superintendent and the board; and (5) his November 1999 interview in The Madison Press. Appellants asserted that Geer defamed Daubenmire by (1) her statements to the board on May 18, 1998; (2) CARE's letter to the editor of The Madison Press published on August 14, 1998; (3) the article published the same date in The Madison Press; and (4) CARE's letter to the editor of The Madison Press published on November 13, 1998.

{¶ 65} Appellants asserted that Sommers defamed Daubenmire by (1) his May 2, 1998 letter to Daubenmire, which was also sent to Allen and the superintendent; (2) his statements to the board on June 15, 1998; and (3) his January 22, 1999 guest column in The Madison Press. Appellants asserted that Wassmuth defamed Daubenmire with her September 1998 letters to the new high school principal and the superintendent.

{¶ 66} In 2002, appellants settled and dismissed their claims against Charles Spinning. Allen and Geer moved for summary judgment. So did Sommers and Wassmuth. Appellants filed memoranda opposing appellees' summary judgment motions. Attached to the memoranda was a single affidavit from Daubenmire, stating: "I have reviewed the affidavits which accompanied [appellees' motions], and have found them replete with falsehoods so numerous that to attempt to rebut them individually would be redundant of the factual arguments set forth in the Memorandum Contra prepared by my attorney.

{¶ 67} "I worked closely with my attorneys in the preparation of the Memorandum Contra and contributed extensively to the factual information included in it. I have read the final product, and found it to be factually true and correct to the best of my knowledge and belief. My participation was diligent, to the point I was given freedom to make corrections wherever I found the draft to contain over-statements or statements that could not be supported by witnesses or documentary evidence.

{¶ 68} "I believe that the Memorandum Contra clearly demonstrates that there are genuine issues of material fact requiring resolution at trial."

{¶ 69} By decision filed February 24, 2003, the trial court granted summary judgment in favor of appellees. This appeal follows in which appellants raise the following assignments of error, which will be addressed out of order.

{¶ 70} "Assignment of Error No. 1:

{¶ 71} "The trial court erred in concluding that plaintiff David Daubenmire is a 'public figure' because there is insufficient evidence to support a finding that he achieved such status *before* defendants' actions made him so, and defendants cannot be relieved from liability due to a status they, themselves, conferred upon plaintiff."

{¶ 72} "Assignment of Error No. 2:

{¶ 73} "The court erred in concluding that all of plaintiffs' claims are time-barred by the statute of limitations."

{¶ 74} "Assignment of Error No. 3:

{¶ 75} "The trial court erred in entering a summary judgment in this matter because there remain genuine issues of material fact and defendants are not entitled to judgment as a matter of law, including the determination of 'actual malice'."

{¶ 76} "Assignment of Error No. 4:

{¶ 77} "The trial court erred in concluding that defendants are relieved of liability due to qualified privilege."

{¶ 78} Summary judgment is properly granted when (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to only one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46; Civ.R. 56(C). An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Burgess v. Tackas* (1998), 125 Ohio App.3d 294, 295, 708 N.E.2d 285.

{¶ 79} To survive a motion for summary judgment in a defamation action, the plaintiff must make a sufficient showing of the existence of every element essential to his or her case. *Heidel v. Amburgy,* Warren App. No. CA2002–09–092, 2003-Ohio-3073, 2003 WL 21373164, at ¶ 11.

{¶ 80} Generally, the essential elements of a defamation action, whether slander or libel, are that "the defendant made a false statement, that the false statement was defamatory, that the false defamatory statement was published, that the plaintiff was thereby injured, and that the defendant acted with the required degree of fault. *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 346–347, 535 N.E.2d 755. Defamatory matter is defined as that which is injurious to another's reputation. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 345–346, 94 S.Ct. 2997, 41 L.Ed.2d 789."

{¶ 81} In their second assignment of error, appellants argue that the trial court erred by ruling that all of their defamation claims were time-barred under R.C. 2305.11(A). Contrary to appellants' assertion, the trial court did not hold that all of their claims were time-barred. Rather, the trial court found that appellants' defamation claims were time-barred *only* in three instances with regard to Allen and one instance with regard to Geer.

{¶ 82} R.C. 2305.11(A) states that "[a]n action for libel [or] slander * * * shall be commenced within one year after the cause of action accrued[.]" A cause of action for slander accrues from the time the slanderous remarks are spoken, whether the defamed person has knowledge of the fact or not. *Lyons v. Farmers Ins. Group of Cos.* (1990), 67 Ohio App.3d 448, 450, 587 N.E.2d 362. A cause of action for libel accrues when the written words are first published. *Reimund v. Brown* (Nov. 2, 1995), Franklin App. No. 95APE04–487, 1995 WL 643939, at * 3.

{¶ 83} Appellants assert that Allen defamed Daubenmire when he addressed the board on April 20, 1998, and when he placed the May 13, 1998 mandatory improvement plan in Daubenmire's personnel file. Likewise, appellants assert that Geer defamed Daubenmire when she addressed the board on May 18, 1998. Appellants filed their first complaint on June 3, 1999, more than a year after the foregoing alleged defamatory actions. Appellants' foregoing defamation claims were untimely filed and are therefore time-barred under R.C. 2305.11(A).

{¶ 84} Appellants nevertheless suggest that the September 5, 1998 Columbus Dispatch article, which quoted, at times verbatim, portions of the memorandum used by Allen in his April presentation to the board, constitute a republication of Allen's presentation that defeats the statute-of-limitations defense. We disagree. Allen categorically denied putting the memorandum in Daubenmire's personnel file, providing the information contained in the article to the reporter, or directing the reporter to look into Daubenmire's personnel file. Against Allen's denial, appellants have failed to produce any evidence showing republication by Allen. They have therefore failed to show that there is a genuine issue of material fact for trial.

{¶ 85} Appellants also assert that Allen defamed Daubenmire in his November 1999 interview in The Madison Press. This defamation claim was not included in appellants' first complaint. It was, however, included in appellants' second complaint, which was filed in July 2001, more than a year after the publication of the interview. This defamation claim was untimely filed and thus is time-barred under R.C. 2305.11(A). Appellants' second assignment of error is overruled.

{¶ 86} In their first assignment of error, appellants argue that the trial court erred by finding that Daubenmire was a limited-purpose public figure. In their third assignment of error, appellants argue that summary judgment was inappropriate, as there were genuine issues of material fact regarding actual malice. In their fourth assignment of error, appellants argue that the trial court erred by finding some of the alleged defamatory statements to be shielded by the doctrine of qualified privilege.

{¶ 87} Defamation is the unprivileged publication of false and defamatory matter about another. See *Heidel,* Warren App. No. CA2002–09–092, 2003-Ohio-3073. There are four classifications into which a plaintiff alleging defamation may fall: (1) a private person; (2) a public official; (3) a public figure; and (4) a limited-purpose public figure. *Talley v. WHIO TV–7* (1998), 131 Ohio App.3d 164, 169, 722 N.E.2d 103. Classification is important because it determines the plaintiff's burden of proof. Id.

{¶ 88} The determination of whether or not a plaintiff is a public figure is a matter of law. *Kassouf v. Cleveland Magazine City Magazines, Inc.* (2001), 142 Ohio App.3d 413, 421, 755 N.E.2d 976. Public-figure status does not depend on the desires of the individual. *Scaccia v. Dayton Newspapers, Inc.* (Nov. 30, 2001), Montgomery App. Nos. 18435 and 18729, 2001 WL 1517043, at * 9, citing *Rosanova v. Playboy Ent., Inc.* (C.A.5, 1978), 580 F.2d 859. A plaintiff may not escape public-figure status if he voluntarily engages in a course of conduct that invites attention and comment. Id. Indeed, the distinction between public and private figures is based upon two considerations: the plaintiff's access to the media and the extent to which the plaintiff, by virtue of his position in the community or involvement in a particular matter of public concern, can be said to invite public comment and attention. *Worldnet Software Co. v. Gannett Satellite Info. Network, Inc.* (1997), 122 Ohio App.3d 499, 507, 702 N.E.2d 149.

{¶ 89} A limited-purpose public figure is a person who becomes a public figure for a specific range of issues by being drawn into or voluntarily injecting himself into a specific public controversy. *Gertz,* 418 U.S. at 351, 94 S.Ct. 2997, 41 L.Ed.2d 789. "Whether a person is a limited purpose public figure is determined by examining that person's participation in the controversy from which the alleged defamation arose, and whether he has attained a general notoriety in the community by reason of that participation." *Talley,* 131 Ohio App.3d at 170, 722 N.E.2d 103. In *Dameron v. Washington Magazine, Inc.* (C.A.D.C.1985), 779 F.2d 736, a three-part test was applied to make that determination: "[T]he court must determine that there is a public controversy; ascertain that the plaintiff played a sufficiently central role in that controversy;

and find that the alleged defamation was germane to the plaintiff's involvement in the controversy." Id., 779 F.2d at 741.

{¶ 90} To recover in a defamation action, a public figure, *including a limited-purpose public figure,* must show by clear and convincing evidence that the statements were made with actual malice, that is, with knowledge that the statements were false or with reckless disregard of whether they were false or not. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686; *Kassouf,* 142 Ohio App.3d at 421, 755 N.E.2d 976. Sufficient evidence must exist to permit the conclusion that the defendant in fact had serious doubt as to the truth of the statements. Id.

{¶ 91} The trial court found that Daubenmire was a limited-purpose public figure. The trial court's holding was based upon (1) Daubenmire's engaging in religious conduct with football players throughout his tenure as a London High School coach and teacher; (2) his appearance on radio and television programs and in the print media both as a coach and an evangelic Christian; (3) his description of the January 1998 meeting between parents and Allen as a "public lynching"; (4) and his attending the second community meeting in April 1998 to defend himself.

{¶ 92} The record supports the trial court's findings. Daubenmire became London High School head football coach in 1989. Throughout his tenure as head coach, he routinely invited clergy to lead prayers in the locker room and on the field before and after the games, initiated the Lord's Prayer on several occasions, recited the prayer with the football team, and read scriptures and used the Bible at some team meetings. He also showed movies such as "Jesus of Nazareth" during class.

{¶ 93} He was disciplined in 1994 for using school stationery and stamps to invite local clergy to participate in a Promise Keepers' breakfast. In 1995, his religious practices prompted the then board president to contact the ACLU. When the superintendent ignored the problem, the board president and another board member resigned. In 1996, Daubenmire sought and obtained Allen's permission to attend a radio talk show on WCVO to discuss coaching and teaching as a representative of the high school. Unbeknownst to Allen when he granted permission, but not to Daubenmire, WCVO was a Christian radio station. Sommers and several parents were so offended by the religiosity of the program that they called Allen about it.

{¶ 94} Daubenmire testified that after he became a Christian in 1988, he frequently spoke on evangelical themes throughout central Ohio at prayer breakfasts and father/son gatherings. While head football coach in London, Daubenmire gave a speech in Lancaster about Promise Keepers, appeared in

1993 on the 700 Club, a Christian television program, regarding the role Promise Keepers played in his life, and was the feature along with his wife of an hour-long program on WSFJ, a religious television station. Although Daubenmire was not solicited to speak or appear on those programs as a coach, he agreed that he was likely introduced as London High School head football coach. Daubenmire also testified that he was named or quoted over the years in numerous articles in the Columbus Dispatch, a central Ohio newspaper, and The Madison Press, regarding the London football program. Daubenmire testified that he knew some of The Madison Press reporters on a first-name basis.

{¶ 95} In January 1998, community member Charles Spinning contacted Allen to complain about a football team dinner he had attended in October 1997 and which was devoted entirely to a religious sermon by one of Daubenmire's assistant football coaches. By then, Daubenmire's religious practices were a concern for several community members. As a result and because Allen and the superintendent were concerned with potential litigation, the issue was included in the mandatory improvement plan. In January 1998, Allen attended a meeting with parents, during which they voiced their concerns about the athletic program, including the football program, and the coaching and treatment of athletes. Daubenmire asked to attend the meeting, but his request was denied. In violation of a direct order from Allen, Daubenmire asked for and received an audiotape of the meeting.

{¶ 96} In April 1998, based in part upon Daubenmire's failure to follow school policies and the administrative chain of command, and his refusal to divulge players' names regarding substance-abuse admission, Allen recommended to the board that Daubenmire's coaching contract not be renewed. The board's renewal of Daubenmire's contract prompted Sommers to arrange for two community meetings in April 1998. At the meetings, concerns were raised about misuse of funds, religious heavy-handedness, students' health, and the fact that coaches turned a blind eye to drug use. The meetings gave an opportunity to community members to talk about their experience with Daubenmire and to express their concerns about the board's decision to retain Daubenmire as coach and the likelihood of Allen's resignation. Daubenmire attended the second meeting to defend himself.

{¶ 97} In his deposition, Daubenmire stated that football was important in London because it paid other sports' expenses. Daubenmire admitted that because of the interest in football, the football coach has a high profile in the community. Daubenmire agreed that he had been a controversial figure in London since 1997 and that the issue of religion in the high school football program had been the subject of controversy in London.

{¶ 98} Based upon the foregoing chronology of events, we find that by the end of April 1998, Daubenmire was a limited-purpose public figure. Appellants concede there was a public controversy. Far from being a passive figure, Daubenmire actively sought to rebut claims against him and successfully defended himself against Allen's recommendation not to renew his contract. Indeed, Daubenmire's personal future as coach was at the very center of the controversy that energized and polarized the London community. As the trial court found: "He created the public controversy surrounding his religiosity in a public school setting and gained general notoriety in central Ohio because of it. Indeed there was a public controversy surrounding separation of church and state, [Daubenmire's] coaching commands and his compliance with chain-of-command issues; he played the central role in the controversy; allegations of defamation were germane to his involvement in the controversy."

{¶ 99} Events in the following months only reinforced his status as a limited-purpose public figure. The events included the formation of CARE, Daubenmire's challenge of CARE's contentions in a front-page article in The Madison Press in June 1998, the resignation of Allen and Geer over the renewal of Daubenmire's coaching contract, Sommers's letter to the ACLU, and Daubenmire's posing with a Bible for an article in the Columbus Dispatch, knowing that the article was about the issue of school prayer. Daubenmire also appeared on the FOX network four times, CBS Evening News, Court TV, and WCVO. Each appearance dealt with the issues of separation of state and church and school prayer.

{¶ 100} We therefore find that the trial court did not err by finding that Daubenmire was a limited-purpose public figure. Having determined Daubenmire's status, we now turn to the issue of whether he presented clear and convincing evidence of actual malice on the part of (1) Sommers with regard to his May 2, 1998 letter to Daubenmire and school officials, his statements to the board on June 15, 1998, and his January 22, 1999 guest column in The Madison Press; (2) Geer with regard to her two letters to the editor of The Madison Press when she was a member of CARE as published on August 14 and November 13, 1998, and the August 14, 1998 Madison Press article referring to her; and (3) Allen with regard to the September 5, 1998 Columbus Dispatch article referring to him, and his December 21, 1998 letter to the superintendent and the board as to the causes of his resignation.

{¶ 101} We first start with Sommers. His May 1998 letter was written following a conversation between Daubenmire and Sommers at a community meeting in April 1998, during which Sommers felt threatened by Daubenmire's mannerisms, use of words, and innuendo. In his letter, Sommers expressed his disappointment about Daubenmire's unwillingness to "resolve the rift at the high

school," and how he felt threatened by Daubenmire's behavior during their conversation. Sommers also addressed Daubenmire's statements at the meeting that this was the first time Daubenmire heard the complaints. In his deposition, Sommers testified that before writing the letter, he talked to Allen, the superintendent, and some teachers, who all confirmed that Daubenmire had met before with Allen and the superintendent. In his deposition, Daubenmire admitted making the statement to Sommers.

{¶ 102} Sommers testified that the purpose of the letter was to tell Daubenmire (1) how he felt he was lied to; (2) how he felt threatened; and (3) where he stood regarding his children. The letter was sent to school officials not to defame Daubenmire but to document and notify school officials of their interaction. Sommers also wanted to put on the record that "there was a potential concern for [Daubenmire] to take retribution on [Sommers's] children." Sommers's letter was based upon his observation of Daubenmire's attitude and comments during the meeting, as well as their interaction.

{¶ 103} Sommers's June 1998 statements to the board referred to "repeated allegations" that Daubenmire had sold performance enhancing drugs, engaged in aggressive religious activities on school time, and operated outside of the high school's policies and administrative expectations. Sommers testified that his statements were based upon significant oral testimony at previous public meetings as well as written documentation he had received. Sommers also had "letters from parents regarding the use or sale of what they termed * * * performance enhancing drugs." Sommers testified that he had "never put anything in writing that [he] didn't have reasonable expectations that it was true."

{¶ 104} In his deposition, Daubenmire admitted buying Creatine from a wholesale company and selling it to some players at a reduced cost around January 1998. Daubenmire stated that he sent a letter to parents telling them he could get Creatine at a reduced cost if their son was using it. Daubenmire described Creatine as an over-the-counter substance that helps to speed up recovery time, which in turn enables athletes to get stronger and train faster and harder.

{¶ 105} By the time Sommers wrote his January 1999 guest column, he had attended several public meetings with parents and citizens who had voiced concerns about Daubenmire. Sommers had participated in a meeting between Daubenmire, Allen, and the superintendent to give Daubenmire the opportunity to discuss the allegations surrounding him. Sommers had also seen Daubenmire's personnel file. In his guest column, Sommers wrote: "Undisputed facts CARE discovered about Dave Daubenmire and other football coaches include misuse of public funds, frequent violations of school policy, Biblical instruction

during school time, opposition to the current and highly praised drug policy, and Dave's refusal to accept his mandatory improvement plan."

{¶ 106} In his deposition, Sommers explained that the term "undisputed facts" meant that the facts had been identified by a community member, a CARE member, or in Daubenmire's personnel file. Sommers also noted that some of the facts were admitted by Daubenmire during the July 1998 meeting.

{¶ 107} Against all of the foregoing, appellants have failed to establish that Sommers's statements (1) in his May 1998 letter to Daubenmire and school officials, (2) to the board in June 1998, or (3) in his January 1999 guest column were made with actual malice. Appellants failed to offer any evidence that Sommers made those statements knowing they were false or with reckless disregard of whether they were false or not. Appellants failed to produce any evidence that Sommers entertained serious doubt as to the truth of his statements. Instead, in his deposition, Daubenmire generally took issue with Sommers's choice of words and statements that he had misused public funds and violated the First Amendment. Daubenmire also generally testified that the intent of Sommers's various statements was to muddy his character and undermine his community credibility through a "drip, drip, drip" effect. However, actual malice cannot be inferred from evidence of intent to muddy. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 118, 573 N.E.2d 609. We therefore find that the trial court did not err by granting summary judgment in favor of Sommers with regard to his May 1998 letter, his June 1998 statement to the board, and his January 1999 guest column.

{¶ 108} Turning now to Geer, the record shows that she was referred to in an article published on August 14, 1998, by The Madison Press, entitled "Letters Warn about Slandering Coach." By then, Geer was no longer assistant principal. The article stated that "Geer said she had made no public statement regarding Daubenmire's character although she does agree with comments made by some who criticize his teaching and coaching methods." In her affidavit, Geer noted that "a reporter mentioned me in the article, did not quote me directly, instead saying that I agreed with others * * *. The reporter never stated what I agreed with or with whom I was agreeing."

{¶ 109} The same edition of The Madison Press published a letter signed by over 40 persons, including Geer, and entitled "CARE members explain position." In her affidavit, Geer stated that "the purpose of the letter was to clear up some criticism which had been made against CARE that its members opposed religion. I had a good faith belief that I had a duty to participate in the sending of the letter to clear up that criticism." Noting that the first mention of Daubenmire in the letter was regarding his showing "Jesus of Nazareth" in class, Geer stated

that "I learned prior to that time that * * * Daubenmire had admitted that he had used class time for that purpose.

{¶ 110} "The other mention of * * * Daubenmire was in reference to the fact that those who signed the letter felt that teaching religion belonged in the home and not in the public school setting. I learned prior to that time * * * Daubenmire had led prayer or had someone else pray * * * before and after * * * football games. I had a good faith belief that the statements contained in the letter * * * were true."

{¶ 111} In November 1998, The Madison Press published a letter signed by Geer, Sommers, and a pastor, on behalf of CARE members, entitled "CARE's Actions are a Response to Board's Inaction." The majority of the letter was in response to the unexpected and unauthorized publication in The Madison Press of communications CARE had had with the board, including CARE's ten points that were to be presented to the board in an attempt to resolve the issues. In her affidavit, Geer stated that she "had a good faith belief that [she] had a duty to participate in the * * * letter * * * to clarify the purpose of the communication that CARE had with the Board."

{¶ 112} The letter ended by referring to "documented evidence of * * * problems regarding Mr. Daubenmire: First Amendment violations; mistreatment of students; failure to follow London City School District policies; disregard of student health and safety issues; [and] lack of cooperation and communication with administration. Despite these facts, the members of the board have chosen to keep him as the football coach." In her affidavit, Geer stated she "had a good faith belief that the statements contained in the letter * * * were true. * * * Any statement that I have made at any time regarding * * * Daubenmire was made in a good faith belief that I had the duty to make the statement and with a good faith belief of the truth of the statement."

{¶ 113} Against Geer's affidavit and deposition, appellants have failed to establish that Geer's statements (1) in her August and November 1998 letters to the editor of The Madison Press and (2) in the August 1998 article in The Madison Press were made with actual malice. Appellants failed to offer any evidence that Geer made those statements knowing that they were false or with reckless disregard of whether they were false or not. Appellants failed to produce any evidence that Geer entertained serious doubt as to the truth of her statements. As with Sommers, Daubenmire generally testified that the intent and goal of CARE members were to muddy his character and undermine his community credibility through a "drip, drip, drip" effect. Daubenmire even described Geer as someone who had a "venomous attitude" toward him and who "was really out to get [him]." However, actual malice cannot be inferred from evidence of hatefulness or ill will. *Jacobs*, 60 Ohio St.3d at 118, 573 N.E.2d 609. We therefore find that the trial court did not err by granting summary judgment

in favor of Geer with regard to her August 1998 letter, her November 1998 letter, and the August 1998 Madison Press article.

{¶ 114} Finally, we turn to Allen. He was referred to in an article published in September 1998 in the Columbus Dispatch. The article reviewed documents contained in Daubenmire's personnel file and reproduced, at times verbatim, portions of the memorandum used by Allen in his April address to the board: "District administrators received complaints during the past several years that Daubenmire and members of his coaching staff were 'preaching to the players, speaking in tongues, laying on of hands for healing and generally pushing their religious philosophies on the kids,' former principal Steve Allen said in an April report to the school board[.] There also were a number of complaints from parents and district staff that he mistreated some players; made inappropriate comments; practiced favoritism toward certain players; refused to acknowledged injuries; and, as head coach, gave no direction to middle-school coaches, Allen said in the same report." The article refers to a "memo written by Allen and placed in Daubenmire's file."

{¶ 115} Allen testified that he gave a copy of the memorandum to the board and the superintendent. In his affidavit, Allen stated that he had a good faith belief the statements in the memorandum were true. Allen denied putting the memorandum in Daubenmire's personnel file, providing the information contained in the article to the reporter, talking to the reporter, or directing the reporter to look into Daubenmire's personnel file.

{¶ 116} In December 1998, Allen wrote a letter to the superintendent and to the board members explaining how the board's renewal of Daubenmire's coaching contract had caused him to resign. In his affidavit, Allen stated that the letter was sent "in a good faith belief that [he] had a duty to apprise them of what contributed to my resigning as principal * * * and in a good faith belief that the statements contained in it were true."

{¶ 117} Against Allen's deposition and affidavit, appellants have failed to establish that Allen's statements (1) in the September 1998 Columbus Dispatch article and (2) in his December 1998 letter to the board and the superintendent were made with actual malice. Appellants failed to offer any evidence that Allen made those statements knowing that they were false or with reckless disregard of whether they were false or not. Appellants failed to produce any evidence that Allen entertained serious doubt as to the truth of his statements. We therefore find that the trial court did not err by granting summary judgment in favor of Allen with regard to the September 1998 Columbus Dispatch article and his December 1998 letter to the board and the superintendent.[1]

---

1. We are mindful of our opinion in *Condit v. Clermont Cty. Review* (1994), 93 Ohio App.3d 166, 638 N.E.2d 96, in which we stated that "[t]he issue of actual malice calls into question the

{¶ 118} Even in cases where a plaintiff has established a prima facie case of defamation, a defendant may invoke the defense of qualified privilege. *Lakota Local School Dist. Bd. of Edn. v. Brickner* (1996), 108 Ohio App.3d 637, 647, 671 N.E.2d 578. Where the circumstances of the alleged defamation are not in dispute, the determination of whether there is a qualified privilege is a question of law for the trial court. Id., 108 Ohio App.3d at 648, 671 N.E.2d 578.

{¶ 119} A publication is privileged when it is "fairly made by a person in the discharge of some public duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." Id. A qualified privilege is recognized when a commonality of interest exists between the publisher and recipient of the communication and the communication is of a kind reasonably calculated to protect or further that interest. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 72 O.O.2d 134, 331 N.E.2d 713; *Cramton v. Brock* (Mar. 23, 1992), Clinton App. No. CA91–05–011, 1992 WL 56765, at 8.

{¶ 120} Nevertheless, a qualified privilege is exceeded when the statements are made with actual malice. *Hahn,* 43 Ohio St.2d at paragraph two of the syllabus. The burden is on the plaintiff to demonstrate by clear and convincing evidence that the defamatory statements were made with actual malice. *Jacobs,* 60 Ohio St.3d at paragraph two of the syllabus.

{¶ 121} In the case at bar, the trial court found that Pamela Wassmuth's statements in her September 1998 letters to the new high school principal and the superintendent were protected by a qualified privilege. There is no dispute as to the circumstances under which the alleged defamatory statements were made or the contents of those statements. In her letter to the new high school principal, Wassmuth detailed her son Daniel's experience with the football team and her opinions about Daubenmire's attitudes and coaching practices. In her letter to the superintendent, Wassmuth outlined the history of relevant events, reflected the views and concerns of other parents and citizens regarding the football program, and expressed her opinions concerning Daubenmire's attitudes and coaching practices.

{¶ 122} "[E]ducators and parents share a common interest in the training, morality and well-being of the children in their care." *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 356, 609 N.E.2d 216. Wassmuth had a good faith interest in the coaching of her son's football team and in the treatment of her son as a football player. Her statements were made to the new

---

defendant's state of mind. It does not readily lend itself to summary disposition." Id., 93 Ohio App.3d at 174, 638 N.E.2d 96. However, in that case, appellant had presented sufficient evidence of actual malice. Such is not the case here, as appellants have failed to produce *any* evidence of actual malice. We therefore find that *Condit* is not applicable to the case at bar.

principal and the superintendent, who had a duty to provide a safe and good education to the children in the London school system. As such, her statements were motivated by a common interest in education and/or safety of the football players, including her son. See id. and *Murken v. Sibbel* (Nov. 16, 2001), Iowa App. No. 00–1239, 2001 WL 1451051 (qualified privilege applies to shield parental complaints about high school coach). The trial court, therefore, properly found that Wassmuth's letters were protected by a qualified privilege. As a result, appellants were required to demonstrate, by clear and convincing evidence, that the defamatory statements were made with actual malice.

{¶ 123} In her deposition, Wassmuth testified that the purpose of her letter to the superintendent was simply to voice her concerns as well as concerns of other parents and citizens. She also testified that the concerned parents and citizens believed that their concerns were true and legitimate and needed to be addressed. She did not testify as to her letter to the new high school principal.

{¶ 124} The trial court found that appellants failed to establish actual malice by Wassmuth. We agree. Appellants failed to produce evidence that Wassmuth's statements in both letters were made with a high degree of awareness of their probable falsity. Appellants failed to list specific facts showing that Wassmuth had serious doubts as to the truthfulness of her letters or that she knew they were false. Appellants assert that Wassmuth's statements were motivated by ill will, hatred, or spite because she was not satisfied as to how her son was treated and used in the football team. However, actual malice cannot be inferred from evidence of intent to injure, ill will, or personal spite. *Jacobs*, 60 Ohio St.3d at 118, 573 N.E.2d 609. We therefore find that the trial court properly granted summary judgment in favor of Wassmuth.

{¶ 125} Based upon all of the foregoing, we hold that the trial court properly granted summary judgment in favor of Allen, Geer, Sommers, and Wassmuth with regard to all of appellants' defamation claims. Appellants' first, third, and fourth assignments of error are overruled.

Judgment affirmed.

VALEN, P.J., and POWELL, J., concur.